(Decided 11th January, 1894.)

---

ALEXANDER SHAW *vs.* HENRY G. DAVIS, and others.

*Corporations—Minority stockholder—Action against Majority stockholders—Bill dismissed.*

A Court of equity will not intervene as to any action of either directors or stockholders of a corporation, at the instance of a

Shaw *vs.* Davis, *et al.*

minority stockholder if the act complained of be neither *ultra vires*, fraudulent nor illegal.

The fact that the acts complained of refer to the dealings of such corporation with another corporation, and that the same persons are officers and hold the majority of the stock in both corporations, while the plaintiff is neither officer nor stockholder in the latter corporation, does not enlarge the jurisdiction of equity to interfere.

A bill by a minority stockholder in behalf of himself and of other stockholders who may join him, against the majority stockholders and officers of one railroad company, praying for an account of the transactions of such company with another railroad company, of which the defendants are also the officers and majority stockholders, and for an injunction to restrain the defendants from executing a permanent lease of the road of the latter company to the former, on the ground that such lease will be most advantageous to the latter company in which the plaintiff has no interest, and most disadvantageous to the former company, is properly dismissed, in the absence of proof of fraud or illegality, the Court having no power to decree a lease or to prescribe the terms of one.

APPEAL from the Circuit Court of Baltimore City.

The appeal in this case was taken from a decree of the lower Court, (DENNIS, J.,) dissolving the injunction previously granted, and dismissing the bill of complaint. The case is stated in the opinion of this Court.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, PAGE, McSHERRY, and BRISCOE, J.

*W. Irvine Cross*, and *Charles Marshall*, for the appellant.

*Bernard Carter*, and *Wm. Pinkney Whyte*, for the appellees.

McSHERRY, J., delivered the opinion of the Court.

We have given most patient and laborious study to the voluminous record now before us, as well as to the full

and exhaustive briefs filed by the distinguished counsel who so ably argued the cause; and, after mature deliberation, we now proceed to state as concisely as possible the reasons upon which the conclusions we have reached are founded.

The West Virginia Central and Pittsburgh Railway Company was incorporated by the Legislature of West Virginia, with an authorized capital stock of sixty thousand shares, of the par value of one hundred dollars per share. Of these shares, when the pending bill of complaint was filed, five thousand were held in trust for the company's treasury; seven thousand two hundred were owned by the appellant, Alexander Shaw; two thousand six hundred by other members of his family; thirty thousand one hundred and ninety-four by Henry G. Davis, Thomas R. Davis and Stephen B. Elkins and their families; and the residue by Thomas F. Bayard, James G. Blaine, William Windom, William Keyser and quite a number of other persons. The road extends from West Virginia Junction, near Piedmont, on the line of the Baltimore and Ohio Railroad in a southerly direction to Davis, in West Virginia, a distance of some fifty-eight miles. The company owns large tracts of coal and timber land, and is chiefly a coal and lumber carrying road. Its sole outlet was, originally, the Baltimore and Ohio Railroad at West Virginia Junction. Not long after it began operations, it encountered serious difficulties with the Baltimore and Ohio, and, as described by Mr. William Keyser, it soon "became apparent that the business of the West Virginia Central was largely diminished, and that it was greatly embarrassed by the lack of harmonious relations; in fact, the West Virginia Central property became almost sidetracked by the lack of facilities, the want of a cordial understanding, and its consequent inability to make contracts which it would be able to fulfil; and at last

Shaw *vs.* Davis, *et al.*

the necessity was forced upon this road to get another outlet or accept the situation of being entirely bottled up.'' As a result of this condition the Piedmont and Cumberland Railway Company was organized and incorporated with a capital stock of thirteen thousand shares, for the construction of a road, parallel to the Baltimore and Ohio, from Piedmont to Cumberland. Of the capital stock Henry G. Davis, H. G. Davis and Brother, and Stephen B. Elkins, hold seven thousand two hundred and ninety-five shares; the Pennsylvania Railroad Company holds four thousand shares, and the residue is held in smaller lots by other persons— Mr. Shaw owning none of it. On May the twenty-first, 1886, a tri-partite agreement was entered into between the West Virginia Central, the Piedmont and Cumberland, and the Pennsylvania Railroad Companies, whereby the latter agreed to set apart five per cent. of its receipts from traffic coming to its road from the West Virginia Central and going from its road to the latter, as a fund to guarantee the payment of the interest on the bonds of the Piedmont and Cumberland road, which were to be issued to the extent of six hundred and fifty thousand dollars, that the money might be thereby raised for the construction of the new road. The West Virginia Central agreed to deliver to the Piedmont and Cumberland all traffic it could control, and the Piedmont and Cumberland agreed to deliver to the Pennsylvania Railroad one-half of all traffic hauled by it to Cumberland; and this agreement was ratified by the stockholders of the West Virginia Central, at a meeting in January, 1887, by a vote of thirty-seven thousand three hundred and ninety-five shares. With the money raised by the negotiations of these bonds, and by a call of a small instalment of the stock subscribed, the Piedmont and Cumberland Railroad was built. When finished, in August, 1887, it was operated by the

West Virginia Central under a verbal agreement for sixty per cent. of the gross earnings. Subsequently, and as will be stated more at large later on, the stockholders of the West Virginia Central appointed a committee to consider, and report at an adjourned meeting to be held on March the fifteenth, 1890, a permanent lease of the Piedmont and Cumberland road. On the fourteenth of March, the appellant, Alexander Shaw, as a minority stockholder of the West Virginia Central, in behalf of himself and of other stockholders who might come in and be made parties, filed the bill of complaint which inaugurated the pending litigation.

The averments of the bill relate to two distinct and disconnected subjects. From paragraph one, to and including paragraph seven, the bill is confined to a statement of transactions between the West Virginia Central, on the one side, and Henry G. Davis, Thomas B. Davis, and Stephen B. Elkins, on the other, and these are introduced, apparently, for the purpose of showing the mode in which these majority stockholders dealt with the company in matters pertaining, not to this proceeding, but to something totally different. The remaining paragraphs of the bill have reference to transactions between the West Virginia Central and the Piedmont and Cumberland, and to the dealings of Henry G. Davis, Thomas B. Davis, and Stephen B. Elkins, as officers and directors of these corporations, with the corporations themselves, and they may be briefly stated as follows: That Messrs. Davis and Elkins, having subscribed for a majority of the stock of the Piedmont and Cumberland road, gave value to their shares by the following process: 1st. With a view of constructing a road that could be cheaply built, they selected a location so low in the valley as to expose the road to heavy and destructive damages in times of floods in the Potomac; that the road was in other respects defectively

constructed, and that it is ruinously expensive to operate; that it was *designedly* so constructed, with a view of having it operated by the West Virginia Central, and of throwing upon the latter company the heavy cost of operating it. 2nd. Before the Piedmont and Cumberland road was in a condition for the transportation of freight or passengers, the Messrs. Davis and Elkins used their *official* power in the West Virginia Central to make the latter company complete the construction of the Piedmont and Cumberland road, and without authority from the stockholders of the West Virginia Central, they, the Messrs. Davis and Elkins, as officials of the two companies made an arrangement by which the West Virginia Central Company began the operation of the Piedmont and Cumberland road in its incomplete condition, whereby the West Virginia Central was made to pay, not only the ordinary cost of operation, but to complete the Piedmont and Cumberland road, and to put upon it betterments and improvements for the benefit of themselves as the principal stockholders therein. 3rd. Whilst the Piedmont and Cumberland road was still a most precarious property, and sure to entail immense expense in its operation, the Messrs. Davis and Elkins determined, at the annual meeting in January, 1890, to risk the attempt to make the stockholders of the West Virginia Central ratify a permanent lease of the Piedmont and Cumberland road, which had been prepared and presented to the meeting; and that the lease was most disadvantageous to the West Virginia Central, and most advantageous to the Piedmont and Cumberland Company; and that the rate of earnings proposed in said lease as a compensation to the West Virginia Central was inadequate, and would be a fraud on the stockholders of that company. 4th. When the lease was proposed to the stockholders, the plaintiff made a violent protest against any lease being executed until the ac-

counts between the two companies should be first adjusted, without which adjustment the earning capacity of the Piedmont and Cumberland road, the expense incident to maintaining it, or a fair rate of rental could not be ascertained. That the confused state of the accounts kept by the West Virginia Central renders any accurate statement impossible; and it would be a fraud on the stockholders of the West Virginia Central to have any lease made before a full settlement of these accounts between the two companies; that Messrs. Davis and Elkins consented to adjourn the stockholders' meeting until March the fifteenth, 1890, and that it is their design at that meeting to use the power which they have as the holders of the majority of the stock of the West Virginia Central to compel the ratification and acceptance of the lease, which they, as officers of the West Virginia Central, have agreed upon with themselves as officers of the Piedmont and Cumberland Company. The prayers for relief are,—first, for a discovery of the ownership of the stock of the Piedmont and Cumberland Railway; second, for a discovery of the holdings of the stock of the Piedmont and Cumberland Company by the West Virginia Central Company, and the moneys spent by the latter company on the road of the first named company; third, for an account as to how much money is due to the West Virginia Central by the Piedmont and Cumberland Company for advances made by the West Virginia Central on any account, and, particularly on account of the completion of the Piedmont and Cumberland which was paid by the West Virginia Central out of the sixty per cent. operating expenses received under the verbal lease, and which ought to have been charged to the Piedmont and Cumberland and paid out of the forty per cent. of the gross earnings received by it, and, fourth, for an injunction to restrain the execution of the proposed lease, or any other lease, until

the Court can ascertain what would be a proper appor-
tionment of the earnings between the leased road and
the operating road, and what, in a word, ought to be the
terms, conditions and covenants of such a lease.

An injunction as prayed was granted on March the
fourteenth, 1890, and on April the twenty-fourth the
defendants answered, denying the material allegations
of the bill, and moved for a dissolution of the injunc-
tion. A general replication was filed, and a large mass
of evidence, covering nearly a thousand printed pages,
was taken. At the hearing the Circuit Court of Balti-
more City on March the twenty-third, 1893, dissolved
the injunction and dismissed the bill. From that decree
this appeal was taken.

It will be observed at the threshold that the relief
prayed for has no relation whatever to the first seven
paragraphs of the bill, and whether the averments con-
tained therein be true or be false is purely a speculative
question under the present structure of the bill of com-
plaint. If those averments had been conceded by the
answers to be true, relating as they do exclusively to
alleged transactions between Messrs. Davis and Elkins
and the West Virginia Central Company, it is not per-
ceived how they could influence or affect, one way or the
other, totally different transactions in no way connected
with or dependent on them. No relief is sought as to
anything averred in these seven paragraphs.

The case, then, before us is that of a minority stock-
holder filing a bill in his own behalf and in behalf of
others who may subsequently join him, to restrain by
injunction the majority stockholders of one railroad
company from leasing, except with the leave of a Court of
equity, and upon the terms which it may prescribe, the
road of another railway company, in which latter com-
pany the majority stockholders are the same persons
who are the majority stockholders in the proposed lessee

company; and also praying for an account between the two companies of antecedent financial transactions. Naturally, the inquiries which such a case suggests at the very outset are,—first, what jurisdiction has a Court of equity to control the internal management of a corporation at the instance of a minority stockholder; and, secondly, in what manner does the circumstance that the majority of the stock is held by the same persons in both the companies, affect the question of jurisdiction?

And, first, it may be stated, as the result of all the authorities, that whenever any action of either directors or stockholders is relied on in a suit by a minority stockholder for the purpose of invoking the interposition of a Court of equity, if the act complained of be neither *ultra vires*, fraudulent, nor illegal, the Court will refuse its intervention because powerless to grant it, and will leave all such matters to be disposed of by the majority of the stockholders in such manner as their interests may dictate, and their action will be binding on all, whether approved of by the minority or not. "In this country," said the late Mr. Justice MILLER, in speaking for the Supreme Court of the United States, in *Hawes vs. Oakland*, 104 *U. S.*, 450, "the cases outside the Federal Courts are not numerous, and, while they admit the right of a stockholder to sue in cases where the corporation is the proper party to bring the suit, they limit this right to cases where the directors are guilty of a fraud, or a breach of trust, or are proceeding *ultra vires*." And so in *MacDougall vs. Gardiner*, L. R., 1 *Ch. Div.*, 13, 21, JAMES, L. J., said: "I think it is of the utmost importance in all these companies that the rule, which is well known in this Court as the rule in *Mozley vs. Alston*, 1 *Ph. Ch.*, 790, and *Low vs. The Governor and Company of Copper Miners*, 2 *Phil. Ch.*, 740, and *Foss vs. Harbottle*, 2 *Hare*, 461, should be always adhered to; that is to say, that nothing connected with internal dis-

Shaw *vs.* Davis, *et al.*

putes between the shareholders, is to be made the subject of a bill by some one shareholder in behalf of himself, and others, unless there be something illegal, oppressive, or fraudulent—unless there is something *ultra vires* on the part of the company, *qua* company, or on the part of the majority of the company, so that they are not fit persons to determine it; but that every litigation must be in the name of the company, if the company really desire it. Because there may be a great many wrongs committed in a company—there may be claims against directors, there may be claims against officers, there may be claims against debtors, there may be a great variety of things which a company may be well entitled to complain of, but which, as a matter of good sense, they do not think it right to make a subject of litigation; and it is the company, as a company, which will make anything that is wrong to the company the subject of litigation, or whether it will take steps to prevent the wrong being done. * * * * Everything in this bill, as far as I can see, if it is a wrong, is a wrong to the company. Whether it ought to have been done, or ought not to have been done, depends on whether it is for the good of the company it should have been done, or for the good of the company it should not have been done; and, putting aside all *illegality* on the part of the majority, it is for the company to determine whether it is for the good of the company that the thing should be done, or should not be done, or left unnoticed." In the same case MELLISH, L. J., after observing that very often, in companies things are done which ought not to be done, proceeds: "Now, if that gives a right to every member of the company to file a bill to have the question decided, then, if there happens to be a cantankerous member, or one member who loves litigation, everything of this kind will be litigated, whereas, if the bill must be filed in the name of the company, then, unless

there is a majority who really wish for litigation, the litigation will not go on. In my opinion, if the thing complained of is a thing which in substance the majority are entitled to do, or if something has been done irregularly, which the majority of the company are entitled to do regularly, or if something has been done illegally which the majority has the right to do legally, there can be no use in having litigation about it, the ultimate end of which is only that a meeting has to be called, and then, ultimately, the majority gets its wishes. Is it not better that the rule shall be adhered to that, if it is a thing which the majority are the masters of, the majority, in substance, shall be entitled to have their will followed? If it is a thing of that nature, it only comes to this, that the majority are the only persons who can complain that a thing which they are entitled to do has been done irregularly; and that, as I understand it, is what has been decided by the cases of *Mozley vs. Alston* and *Foss vs. Harbottle*. In my opinion this is the rule to be maintained." See also, *Gray vs. Lewis*, L. R., 8 Ch. App., 1050.

Secondly. The fact that the same persons hold the majority of the stock in both companies does not of itself enlarge the Court's jurisdiction; the act complained of furnishes the test of jurisdiction, and it must be *ultra vires*, fraudulent or illegal; nothing short of this will suffice. This is true even in a case where directors and not stockholders do the act complained of. *Booth, et al. vs. Robinson, et al.*, 55 Md., 441. And for stronger and more obvious reasons it is also true in a case where stockholders themselves act directly. They are not trustees or *quasi* trustees for each other. Even a director is not, strictly speaking, a *trustee*. *Spering's Appeal*, 71 Pa. St., 11; *Smith vs. Anderson*, 15 Ch. D., 247. In *Pender vs. Lushington*, L. R., 6 Ch. Div., 70, JESSEL, M. R., in speaking of the rights of a stockholder said: "I cannot de-

prive him of his property, though he may not make use of the property in the way I approve. This is really the question, because, if these stockholders have a right of property, then I think all the arguments which have been addressed to me as to the motives which induced them to exercise it, are entirely beside the question." Then, after referring to a decision by MELLISH, the Master of the Rolls proceeded: "In other words, he (MELLISH, J.) admits a man may be actuated in giving his vote as stockholder, by interests adverse to the interests of the company as a whole; he may think it was for his particular interest that a certain course may be taken which may be, in the opinion of others, adverse to the interests of the company as a whole;· but he cannot be restrained from giving his vote in what way he pleases, because he is influenced by that motive. There is, if I may so say, no obligation on a shareholder of a company to give his vote merely with a view to what other persons may consider the interests of the company at large. He has a right, if he thinks fit, to give his vote from motives or promptings of what he considers his own individual interests. This being so, the arguments which have been addressed to me, as to whether or not the votes which were given, would bring about the ruin of the company; or whether or not the motive was an improper one which induced these gentlemen to give their votes, or whether or not their conduct shows a want of appreciation of the principles on which this company was founded, appear to me to be wholly immaterial." And in *Manhattan Elev. R. Co. Case*, 11 *Daly*, (*N. Y.*,) 516, the Court says: "It is argued that, if common directors are disqualified from acting, so are common stockholders incapable to ratify agreements between their companies; and that the holder of one share of stock in each company could prevent any action at a stockholders' meeting relating to the two companies, no

matter how advisable that action might seem to the holder of every other share. I do not say that the disqualification extends to a shareholder. I see no reason why it should. The disqualification rests entirely on the fiduciary relation. A shareholder is trustee for nobody; he has only his own interests to look after as such stockholder; closely connected, undoubtedly he is in practice with every other stockholder, but he holds no such fiduciary relation to the corporation as stockholder as he holds as director." *Beach, Corp. Ch. XIII, sec.* 247.

Accepting these propositions as the fixed and settled law, it remains now to inquire whether the proof sustains the allegations of the bill, and brings the case within the legal principles to which reference has just been made.

If the Messrs. Davis and Mr. Elkins selected, as alleged, an improper location for the Piedmont and Cumberland road, and improperly constructed that road, so that it would be ruinous to operate it, and if they did this with a view of throwing the heavy cost of operating it on the West Virginia Central,—it is difficult to assign a reason for such singular conduct. On its face the allegation is, to say the least, improbable. Those gentlemen owned over thirty thousand shares of the fifty-five thousand issued shares of the West Virginia Central Company, whilst they owned but seven thousand two hundred and ninety-five shares of the Piedmont and Cumberland road; and that they would purposely and designedly wreck their larger and more valuable holdings in the West Virginia Central merely for the purpose of realizing an income from a smaller and dependent road, in which their aggregate shares were not one-fourth of the amount owned by them in the main enterprise, is quite incomprehensible. Certainly no motive for such a strange course has been

shown. But apart from the improbable character of the allegation, it is not supported by the evidence. The Piedmont and Cumberland road was located by an experienced and competent engineer, who was the chief assistant of the late J. N. Du Barry, at that time second vice-president of the Pennsylvania Railroad Company. He made a careful examination of the route of the proposed road, and selected, according to his testimony, the most suitable location that was available. He submitted his surveys and profiles to the engineering department of the Pennsylvania Railroad Company, and even laid them before Mr. George B. Roberts, the president of that company, and an engineer of high reputation, and they were fully approved by both. He testified that the grades were arranged as high as was deemed necessary to keep beyond the reach of extreme high water, and that taking into consideration its location, its alignments, its grades, and the mode in which it was built, the road, for economical operation, was equal to that of the Baltimore and Ohio. Besides this, it was proved by Mr. Charles H. Latrobe, an accomplished engineer in no way connected with or interested in this litigation, that he had made an examination of the Piedmont and Cumberland road, that its general alignment was good, that it had a very considerable proportion of long tangents, and not more than the usual amount of curvature, which might be reduced at very moderate expense, and that it was superior in this respect to the West Virginia Central, because rectifications of the line could be more readily made. As opposed to this, the record contains the testimony of Mr. Wrenshaw, also an engineer, criticising the location and construction of the road. Though there is this difference of opinion between these engineers, and though, too, a freshet did some small amount of injury to the road in 1888, and an unprecedented flood in 1889

caused considerable damage to it, that might not have happened had the road been built higher above the Potomac river, still, we are not authorized to decide whether, in point of fact, the best location was selected that might have been selected, but only to determine from the evidence whether the location, as made, was made in good faith, or, on the contrary, with the fraudulent design imputed in the bill. We not only see nothing in the record to support this allegation of fraud, but, on the other hand, we are quite fully satisfied, after carefully considering the evidence, that the Piedmont and Cumberland Railway was projected, located, and constructed in entire good faith, with a view of furnishing a necessary outlet for the traffic of the West Virginia Central road, whereby the property of the latter company would be made valuable to its owners.

Now, as to the charge that before the Piedmont and Cumberland road was in a fit condition for the transportation of freight and passengers, Messrs. Davis and Elkins used their powers as officers of the West Virginia Central to make that company complete the Piedmont and Cumberland, and that, without authority from the stockholders, but by virtue of their control over the West Virginia Central as majority stockholders, and in their capacity as officers of the two companies, they made an agreement under which the West Virginia Central undertook to operate the Piedmont and Cumberland upon such terms as would benefit themselves as stockholders of the Piedmont and Cumberland, and would permanently better and improve the latter road, to the detriment of the stockholders of the former road. There is no foundation in the evidence to support this accusation. The West Virginia Central began to operate the Piedmont and Cumberland in August, 1887; and whilst the road was then, as is necessarily the case to a greater or less extent, with all newly built rail-

roads, less complete than it was made afterwards, yet, so far from its being unfit for the transportation of freight, it is in testimony by the superintendent that from that day up to the time he was examined as a witness there never had been a car derailed, or, as he states it, there never had been a wheel off the track.    He further testified that the road was well ballasted with stone, except in a few bottoms, where sand ballast was used, and that, when turned over to the West Virginia Central to be operated, it was superior to the condition of the Parkersburg Branch of the Baltimore and Ohio when it was turned over to the latter company.    Going no farther back than January, 1887, we find that Mr. Davis and the directors, amongst whom was the plaintiff, Mr. Shaw, stated in the annual report to the stockholders of the West Virginia Central Company, that it would probably be found to the interest of the West Virginia Central to operate the Piedmont and Cumberland road, which was not then completed; and accordingly, at the meeting of the new board of directors convened the next month, a resolution was adopted conferring upon the president, Mr. Henry G. Davis, full authority, with the advice and assistance of the company's counsel, the Hon. Wm. Pinkney Whyte, to make such an agreement for the operation of the Piedmont and Cumberland road by the West Virginia Central, as he might deem best, in the interest of the West Virginia Central, and directing him to report the result to the next stockholders' meeting.    In January, 1888, Mr. Davis reported to the stockholders of the West Virginia Central at their annual meeting, that no permanent arrangement had been made for the lease of the Piedmont and Cumberland road, but that the latter road was then being operated by the West Virginia Central for sixty per cent. of the gross earnings of the new road.    And this statement was repeated in the annual report made

to the stockholders of the West Virginia Central in January, 1889. These reports of 1887, 1888 and 1889 were all *unanimously* adopted and approved by the stockholders of the West Virginia Central. This temporary arrangement, under which the West Virginia Central operated the Piedmont and Cumberland road up to the time of the filing of the bill, was therefore not made merely by the *officers* of the two companies, but its terms were known to and fully and explicitly ratified and approved by all the stockholders of the West Virginia Central who were present or represented at the annual meetings of 1887, 1888 and 1889, without dissent. At the annual meeting of the stockholders of the same company in 1890, where fifty-four thousand two hundred and sixty-eight shares out of the fifty-five thousand issued shares were represented in person or by proxy, a resolution was offered by one of the stockholders proposing to lease the Piedmont and Cumberland road, the lessee to pay all the costs and expenses of operating the road, and to receive sixty per cent. of the gross revenues, and accompanying the resolution was a draft of the proposed lease. A substitute was moved to the effect that the proposed lease be referred to the board of directors for examination, with a view that it might be determined whether its provisions would "promote and protect the interests of the company." Thereupon Governor Whyte proposed the following amendment, which was adopted without any dissenting vote, so far as the minutes disclose, though Mr. Shaw was present in person, viz., "*Resolved*, That the lease proposed be referred to a committee of three stockholders, to report as to the propriety of its acceptance, to an adjourned meeting of the stockholders, and when this meeting adjourns, it shall be adjourned to the fifteenth day of March, 1890, at 12 M., at this place, when this subject shall be considered." On the fif-

teenth of March, when the meeting of stockholders re-convened, the committee appointed under Governor Whyte's resolution reported the form of lease which they had prepared, varying somewhat the terms of the one proposed at the meeting in January, and recommended that the percentage of gross earnings to be paid to the West Virginia Central by the Piedmont and Cumberland should be sixty-three per cent. instead of sixty per cent.; but no action was taken by the stock-holders, because the injunction applied for and issued the day previous was served before the meeting assembled. These facts demonstrably show the error of the averment which charged that the Messrs. Davis and Elkins designed to use the power which they held as owners of a majority of the West Virginia Central's stock to compel the ratification and acceptance of a lease which they, as *officers* of the West Virginia Central, had agreed on with themselves as *officers* of the Piedmont and Cumberland road.

We come now to the averment that large sums of money expended on account of construction of the Piedmont and Cumberland road after August the first, 1887, were improperly charged to the West Virginia Central, and improperly paid by it out of the sixty per cent. of gross earnings received by it for operating the Piedmont and Cumberland road, whilst they should have been charged to the Piedmont and Cumberland, and should have been paid out of its forty per cent. of those earnings. The total aggregate of these alleged erroneous charges, as calculated by Major Bulkley, an expert accountant produced by the plaintiff, is the sum of thirty-two thousand, two hundred and forty-eight dollars, and, without pausing to examine the lengthy statement item by item, we will assume that the aggregate amount was improvidently charged to the West Virginia Central, and that upon a strictly technical system of

accounting the whole of this should have been paid by the Piedmont and Cumberland Company; but still the material question recurs, was the charge of this sum to the West Virginia Central as made, made merely in error or in bad faith or fraudulently? If made in good faith, though inaccurately made, a Court of equity has no jurisdiction at the suit of a stockholder to readjust the account. Under such conditions, the company injuriously affected must itself seek the appropriate redress. Courts cannot intervene in the absence of fraud or illegality, or where the act is not *ultra vires*, to control, manage or regulate corporate business. The question of *ultra vires* has nothing to do with this branch of the case. The leasing of the one road by the other was perfectly lawful, and a mere dispute as to the method of keeping certain of the accounts between them could not raise an issue of *ultra vires*, especially when there is no unvarying, fixed or unbending system controlling the classification of items in such an account as this. But the evidence signally fails to show any fraud whatever in this transaction. It is often a debatable matter whether particular items ought to be charged to operating expenses or to construction account. Different accountants may honestly disagree as to which of the two accounts a given item should be charged. Necessarily, then, some officer of the lessee company must, in the first instance, decide the question. If he decides wrongly, it does not follow that he has decided wrongfully or fraudulently. This is made perfectly clear by Mr. Keyser in his intelligent testimony, from which we now quote briefly: "Taking the two accounts together and looking at them from all the light that I can get, I should say the president of the West Virginia Central and Pittsburg Railway Company, had dealt liberally by the Piedmont and Cumberland road in his method of charging these accounts. If the system of an accountant was to be adopted, and every

item charged upon the strict basis of a construction account, I think the carrying out of that principle would eliminate a large amount of these charges against the Piedmont and Cumberland road growing out of the flood· In other words, I cannot see how the president could be tied down to any strictly defined method of accounting that would enable him to accept, on the one side, Mr. Bulkley's accounts, and, on the other side, justify him in his method of charging the Piedmont and Cumberland road with these large items of practical repairs,— because that is what they were, growing out of an unusual and disastrous flood.  *  *  *  *  I think the discretion in a case of this kind should be placed in the hands of the president, in the absence of anything which binds it down by any definite rule, as adopted by the two companies.  *  *  *  *  I think in this case, and I speak now as a stockholder in the West Virginia Central road, that, looking at these accounts, and looking at the lease, as I did when I was on the committee, and in the absence of anything in the way of a definite, clear provision for this business between the two companies, that the matter of stating the accounts has been a fair one on the part of the president, and if I were to criticize it at all I should say he leaned against the interests of the Piedmont and Cumberland Railroad in charging rather too much.''

But there is still another view of the subject.  Whilst President Davis charged up this sum of $32,248 to the West Virginia Central, he charged to the Piedmont and Cumberland a much larger sum for other and different expenses, which ought to have been paid by the West Virginia Central; and, therefore, whatever error he made in the first instance was more than counterbalanced by the subsequent error against the Piedmont and Cumberland road.

There is one other account alluded to, which may be disposed of in a very few words.  There is an allegation

that there is money due by the Piedmont and Cumberland for advances made to it by the West Virginia Central for original construction, and growing out of other dealings since. The evidence, however, shows that it is the West Virginia Central which is indebted to the Piedmont and Cumberland.

What we have said in considering the subjects just discussed applies equally to so much of the prayer of the bill as relates to the relief sought by way of account, and without repetition we need only add, that the plaintiff has failed to support by evidence the averments upon which the jurisdiction to grant that particular relief depends. There is no pretence that the two companies had not the necessary powers, under their charters and under the law, to enter into the business relations out of which these questions of account arose. The transactions themselves were not illegal, and however erroneous the accounts may be conceded to be, when considered 'from the standpoint of a professional accountant, there has been literally nothing adduced to show that the alleged errors were fraudulently or designedly committed, with a view of benefiting the stockholders of the Piedmont and Cumberland Company at the expense of the Stockholders of the West Virginia Central Company.

Nor does the making of a lease by the Piedmont and Cumberland road to the West Virginia Central Company necessarily depend upon the state of antecedent accounts between the two companies. Whatever unadjusted or erroneously adjusted accounts there may be can as readily be balanced and settled after, as before, a lease has been executed. And if the proposed lease be not *ultra vires* or unlawful or fraudulent, no Court, at the instance of a minority stockholder, or at the instance of any one else, has the power or the right to restrain the majority from dealing with the property as they may deem most advantageous to their own interests. Any other doc-

trine would put it in the power of a single stockholder, owning but one share out of many hundreds, to transfer the entire management of a corporation to a Court of equity and would effectually destroy the right of the owners of the property lawfully to control it themselves. It would make a Court of equity practically the guardian, so to speak, of such a corporation, and would substitute the Chancellor's belief as to what contracts a corporation ought, as a matter of expediency, or policy, or business venture to make, instead of allowing such questions to be settled by the persons beneficially interested in the property. No such arbitrary or dangerous power has ever been claimed by any Court, and, if laid claim to, it would never be tolerated in a free government.

The injunction granted on March the fourteenth, 1890, prohibited the making of a lease upon the terms of sixty per cent. of the gross earnings or any *other* lease, until the further order of the Court. Apart from all questions of *ultra vires*, illegality, and fraud, this power thus assumed, undertook to reserve to the Court the authority to prescribe the terms of any lease, because it prohibited the making any lease, without the Court's leave. When the terms are not agreed to, the conditions not named and the covenants not formulated, what authority exists in the Chancellor to assume in advance that an act *ultra vires*, or that fraud or illegality will be attempted? In the case at bar the lease which was actually prepared under the circumstances we have already stated at large—which are a flat negation of any fraud or secrecy—made no provision for a sixty per cent., but for a sixty-three per cent. proportion of the gross earnings, and there is nothing to show—even if we had the right to go into an examination of the subject—that such a proportion of the gross earnings would be an unfair or inadequate rental. As the Court had no power to decree

a lease, so it had no power to prescribe the terms of one. It could prohibit the doing of an act *ultra vires*, illegal or fraudulent, beyond that it could not go.   As no such act was before it, it did right in dissolving the injunction, and in dismissing the bill.

For the reasons we have given we will affirm the decree appealed from.

*Decree affirmed, with .*
*costs above and below.*

(Decided 11th January, 1894.)