## JOHN H. URNER *vs.* LAWRENCE R SOLLENBERGER.

*Corporations—Subscription to Capital Stock Obtained by Fraud—Repudiation Within a Reasonable Time—Fraudulent Contract Between Directors or Promoters and the Corporation—Avoidance—Assignment for the Benefit of Creditors—Equitable Defence in Action at Law.*

In an action against a subscriber to the stock of an insolvent corporation to recover the amount of his unpaid subscription, he cannot set up in defence that the debts of the corporation were created by the fraudulent contracts of the directors, when the corporation itself did not disaffirm the contracts, or they have not been avoided by a de-

cree of Court, and when the subscriber failed to repudiate his subscription within a reasonable time, after knowledge that the same had been obtained by fraudulent representations.

A contract between the directors and promoters of a corporation on the·one hand, and the corporation on the other, which is fraudulent because the directors obtained an unfair gain, in violation of their trust, may be avoided by the corporation itself just as any other contract obtained by fraud is voidable at the option of the party upon whom the fraud has been practiced.

But such a contract is binding until avoided, and can only be avoided and disaffirmed by the corporation itself acting by a majority of its directors or stockholders or by a decree of Court. A stockholder when sued upon his subscription to the capital stock is not entitled to disaffirm such a contract.

The right of a minority stockholder to appeal to a Court of Equity to annul an illegal or fraudulent contract made by the directors of a company, does not imply that such stockholder may, by his own act, disaffirm such a contract. The disaffirmance must be either the act of the corporation or the act of a Court.

An assignment for the benefit of creditors by a corporation to pay all its debts ratably is not invalid because some of the debts were created by fraudulent contracts, such as could have been avoided by the corporation, and which had not been ratified by it, or because the trustee accepted the deed with knowledge of the fraud in the contracts.

The previous authority or subsequent ratification by all of the stockholders is not essential to the validity of a sale of property to the corporation by some of its directors

A plea in an action at law by way of equitable defence does not confer upon a Court of Law the jurisdiction of a Court of Equity, but the facts pleaded must show a case where Equity would restrain the execution of the judgment.

Certain directors and promoters of a foreign corporation bought land, paying therefor a part of the purchase money in cash and giving their notes for the balance. These lands they soon afterwards sold to the corporation for more than five times as much as they had given, the company paying part of the consideration in money and giving its promissory notes to the directors for the balance, and the corporation also assumed the payment of the notes given by the directors to their vendors The corporation becoming insolvent, executed an assignment to a trustee for the benefit of its creditors, who brought suit to recover from defendant, a stockholder, the balance due on his subscription to the capital stock. *Held*,

1st. That since defendant subscribed to the stock when he was ignorant of these fraudulent transactions, and when he was informed that

there was no promoters' fund or advantage, he could have revoked his subscription upon the ground of fraud, if he had acted while the company was a going concern, and within a reasonable time after the discovery of the fraud.

2nd. That if the defendant failed to repudiate his contract for subscription within a reasonable time after acquiring knowledge of the fraud, and it is a question of fact for the jury whether he did so or not, then he is liable in this action.

Appeal from the Baltimore City Court (PHELPS, J.) The prospectus of the Roanoke Development Company, dated October, 1890, announced that the company proposed "to purchase 1,300 acres of land lying adjacent to the corporate limits of Roanoke and directly west of the centre of the town. The property has a frontage of about two and a-half miles on the Roanoke River, and comprises some 300 or 400 acres of fine bottom lands, suitable for business and manufacturing purposes. The rest of the property is, for the most part, high table-land and admirably adapted for town purposes. The capital of the company is to be $1,100,000, of which $500,000 is for the purchase of the property, and the remaining $600,000 will be available to aid in the establishment of manufacturing enterprises on its lands, and for the improvement of its property. The lands of the company will be developed on a large scale. A fine bridge will be built immediately connecting them with the corporate limits of the city; an electric street railway will be constructed over a large part of the company's lands and across the bridge, and will be extended to the centre of the city as soon as the necessary franchises can be obtained. This railway will bring the property within a few minutes' ride of the business part of the town. The company proposes to lay off, and so improve some 300 or 400 acres of its land, as to render them unquestionably the most desirable residence quarter of Roanoke. This property lies high, commanding magnificent views, and for beauty of location surpasses the West End and Mountain View tracts. The electric railway will render it more accessible than these last-named tracts, in which property is now selling at an

average price of $8,000 per acre.   Upon the completion of
of its improvements the company can readily sell 100 acres
of this land for $5,000 an acre, or $500,000, the entire cost
of the 1,300 acres purchased.   It will be the policy of the
company to reserve a large number of lots in every section
laid off in order to share in the great appreciation in
value that will follow the development and improvements."

At the trial the following prayers were offered :

*Plaintiff's 2nd Prayer.*—If the jury shall find from the
evidence that the Roanoke Development Company was a
corporation formed on or about October 11, 1890, and that
the defendant, John H. Urner, subscribed to ten shares of
the capital stock of the said company, payable, except as to
the first 20 per cent. thereof, at such times as the board of
directors might prescribe, and that more than $500,000 of
the common stock of said company was subscribed for, and
that on or about the 3rd day of April, 1894, the board of
directors of the said company, by resolution, called for the
payment of 20 per cent. of the amount of such subscription,
payable April 16, 1894, and that notice of said call was
promptly made to the said defendant, John H. Urner, ad-
dressed to his address in Baltimore, and that subsequently
the Roanoke Development Company executed the deed of
trust, offered in evidence, to Lawrence R. Sollenberger, trus-
tee, and shall further find that the defendant executed the
proxy dated the 23rd day of January, 1894, and offered in
evidence, then the plaintiff is entitled to recover, even though
the jury shall further find that the defendant was induced
to make his subscription by the fraudulent representations
of the promoters and agents of the Roanoke Development
Company, offered in evidence.   (*Granted*).

*Plaintiff's 3rd Prayer.*—If the jury shall find from the
evidence that the Roanoke Development Company was a
corporation formed on or about October 11th, 1890, and that
the defendant, John H. Urner, subscribed to ten shares of
the capital stock of said company of the par value of $100 per
share, payable except as to the first 20 per cent. thereof at

such times as the board of directors of said company might prescribe ; that more than $500,000 of said common stock of said company was subscribed for and entered upon the subscription list of said company, and that on or about the 3rd day of April, 1894, the board of directors of said company, by resolution, called for the payment of 20 per cent. of such subscription, payable April 16, 1894 ; that notice of said call was sent to said John H. Urner, addressed to his address in Baltimore ; that subsequently the Roanoke Development Company executed the deed of trust, offered in evidence, to Lawrence R. Sollenberger, trustee ; and they shall further find that this defendant was induced to make his subscription by reason of the false and fraudulent statements of the promoters and agents of said company, that then the plaintiff is still entitled to recover, unless they shall further find :

That he made his subscription upon the faith and truth of said representations, without knowledge of the secret profit of said promoters.

And that promptly after the time when the defendant could have by reasonable diligence have discovered the untruth of said representations, he repudiated his subscription, and notified the said company thereof.

And that he never, after the time he knew of said fraud, or by the exercise of ordinary diligence could have discovered it, acted as stockholder in said company or exercised any rights as such. (*Granted*).

*Defendant's 1st Prayer.*—Even if the jury find that the defendant subscribed to 10 shares of the stock of the Roanoke D. Co. and paid thereon $600, still, if they further find that said subscription was made upon the terms and conditions contained in the prospectus, offered in evidence, and upon the faith of representations contained therein and verbally made to him by a certain Jas. S. Simmons, a director of said company, as to facts of a nature to induce said subscription, and shall further find that said representations were false and fraudulent as to said facts, and that the defendant

learned of the fraudulent nature of said representations and
of said prospectus, and within a reasonable time thereafter
and while the company was still a going concern, notified
the said company that he would make no further payments
upon his said subscription, then their verdict should be for
the defendant, unless they shall further find that the defend-
ant failed to exercise reasonable diligence under all the cir-
cumstances of the case in ascertaining the fraudulent nature
of said representations, or that he failed to finally repudiate
his said contract after acquiring knowledge of said fraudu-
lent representations.   (*Granted*).

*Defendant's 2nd Prayer.*—That if the jury find the facts
set forth in the defendant's first prayer, and shall further find
that a large portion of the indebtedness secured by the deed
of trust offered in evidence, arose from sales of land to said
company by its officers, to the amount of five hundred
thousand dollars ($500,000.00), and that said sum exceeded
the amount paid for said land prior to the sale of the same
to said company by over four hundred thousand dollars
($400,000.00), and that said land was purchased by said
officers for the purpose and with the intention of selling the
same to said company at the price mentioned in said pros-
pectus, then said sales were fraudulent and voidable as to
said company; and if they further find that said purchases
were never submitted to the stockholders of said company
for ratification, and that at the time of accepting the said
deed of trust, the plaintiff had knowledge of the facts here-
inbefore set jorth and required to be found by the jury, and
accepted the said deed for the purpose of enforcing the same
against the stockholders of said company, then the said deed
of trust is void, and the plaintiff is not entitled to recover
under the pleadings in this case.   (*Refused*).

*Defendant's 3rd Prayer.*—That no valid sale of land
could be made to the said company by officers and directors
of said company, unless the purchase of said lands was
authorized or ratified and approved by all the stockholders
of said company, with full knowledge of the fact that said

land had been sold to said company at the prices shown in evidence by its officers and directors, and that there is no evidence legally sufficient to show such authority to buy said lands or to issue the obligations of the company for the purchase price thereof. (*Refused*).

*Defendant's 4th Prayer.*—It being admitted that the subscription of the defendant to the stock of said company was procured by means of the representations and statements contained in the prospectus offered in evidence, and it being admitted that the land mentioned in said prospectus, as being the land purchased by said company from its officers and directors, consisted altogether of land purchased by said company from its officers and directors, and there being no sufficient legal evidence that such purchases were authorized or ratified by said company, said purchases were not purchases of land within the terms of said prospectus, and there was a failure to comply with the terms of said prospectus with reference to the purchase of land ; and if the jury find that at the time of issuing said prospectus and obtaining said subscription of the defendant, the persons forming said company and issuing said prospectus intended and designed to purchase the land mentioned in said prospectus in the manner in which the same was purchased, as shown in evidence, then the jury are instructed that the obtention of said subscription was fraudulent and confers no right of action upon the plaintiff in this suit, and their verdict must be for the defendant, unless the jury should further find that the defendant in this case, with knowledge of the manner in which said property was purchased, failed to repudiate his subscription within a reasonable time. (*Refused*).

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD and SCHMUCKER, JJ.

*Charles Marshall* and *J. Markham Marshall*, for the appellant.

There are two separate and distinct questions presented by the appeal in this case.    In all the cases of this character that have been before this Court the trustee has appeared suing to recover upon calls upon the stockholders, made by the decree of a Court of Equity in a suit to which the company, on whose stockholders the call was made, was a party. Calls made upon stockholders in that way are conclusive and unimpeachable, except for fraud in the obtention of the decree or want of jurisdiction over the company. *Hawkins* v. *Glenn*, 131 U. S. 328; *Glenn* v. *Williams*, 60 Md. 93. But in the present case we have a call made by the board of directors of the company, and the right to collect it assigned by the company to the plaintiff, as trustee for the benefit of creditors.

The liability of the defendant, who is a stockholder, depends upon two conditions, according to our view. *First.* Upon the terms of the contract of subscription. *Second.* Upon the validity of the deed of trust.    Under the laws of Maryland this deed of trust would pass no title without security given by the trustee, but under the laws of Virginia he can only be compelled to give security upon application to the Court for cause shown.    In considering the first question, that is, the liability of the defendant upon his contract of subscription, and the question as to whether these terms have been complied with by the company, that question also involves the question as to whether the defendant, if there was deception and fraud practiced upon him in obtaining his subscription, took proper caution in due time to annul his contract of subscription, in accordance with the views expressed by this Court that such a contract, if secured by fraud, can be annulled by the subscriber if he does so in due time, and while the company is a going concern.    That branch of the subject also requires the discussion of the question as to whether the defendant, after opportunity of knowing the fraud that had been practiced upon him, had done any act amounting to a recognition of his liability as a subscriber, and it will be found upon exam-

ining the record, that it was made to turn, as it went before the jury, upon the question is to whether there had been such a recognition by the defendant of his liability, after he knew or had an opportunity to know that his subscription had been obtained by fraud.

There was evidence on both sides on the question as to whether there had been such a recognition by the defendant, and the plaintiff relied mainly upon a proxy, which it was alleged the defendant had given to the plaintiff himself, to attend a meeting of stockholders, which was held after he had opportunity of knowing the fraud that had been perpetrated on him. There was some evidence that the proxy itself had been obtained by fraud; that it was a proxy that had been given before the fraud was discovered, the date of which had been altered, so as to make it a proxy executed for a meeting of stockholders to be held after the fraud was discovered, and the case, as actually submitted to the jury, turned upon the question of the integrity of that proxy, the the same being filled up in the handwriting of the plaintiff, and the date of it bearing evidence of an alteration. The instructions of the Court fully cover these questions, but there was one question with reference to which the instructions, we claim, are erroneous, and that question was as to the right of the plaintiff to bring this suit. A plea by way of equitable defence was filed by the defendant, and issue joined thereon, and certain instructions applicable to that issue were refused by the Court below, and are presented by the exceptions in this case.

The trustee could not collect anything except what was due under the terms of the contract of subscription. His right to sue must be based upon the right to sue under these contracts, and the instructions with reference to the validity of the deed of trust depend altogether upon the question as to whether these contracts of subscription could be enforced by the company, for the purpose of paying debts of the character described in the defendant's second prayer. For this reason we submit that the Court

ought to have held that, upon the facts stated in the defendant's second prayer the plaintiff acquired no title to the right of action conveyed to him by the deed of trust, and that independent of every question as to whether the defendant had repudiated his contract of subscription, and assuming in point of fact he had not done it, and was validly a subscriber to the stock, the trustee, having no title to receive his subscription, except that which the company had, ought not to be permitted to recover, because the title of the trustee is fraudulent and invalid.

The defendant's second prayer and his third plea, taken together, amount in substance and effect to a bill in equity filed by the defendant as a stockholder, to enjoin the company from enforcing illegal and fraudulent claims against the corporation, of which he is a member. We recognize the principle, that the right to sue in all matters relating to corporate affairs rests in the first instance with the company, and that a stockholder must allege and prove that he has exhausted every effort to secure action by the company, before he will be entitled to sue in his own name, but in the present case the suit is in effect against the company itself, in the person of the trustee, it having made a deed of trust to him for the purpose of securing the payment of claims, the enforcement of which it should properly resist. Obviously, in a suit against a company to prevent it from carrying out an illegal object, it would be idle for a stockholder to allege and prove that he had exhausted every effort to induce it to act in his behalf. We also recognize the principle that the mere presence of fraudulent claims, along with honest ones in a deed of trust, need not invalidate the deed, but when the deed of trust, "*by its terms may operate as an instrument in aid of the fraud*," or where the grantee in a deed of trust accepts the deed with knowledge of the fraudulent intent of the grantor, and with the intention of carrying it into effect, then the deed is void. *Farrell* v. *Farnen,* 67 Md., 81.

Now, in the present case, the trustee not only accepted

the deed of trust, with knowledge of the fraudulent nature
of the claims secured by it, and with the intention of en-
forcing the deed according to its terms, but were his own
intentions ever so honest, he could not sue upon the cause
of action conveyed to him by the company, without carry-
ing into effect the illegal and fraudulent object of the deed
of trust.   A corporation in failing circumstances can only
call on its stockholders for an amount sufficient to pay the
claims of all *honest* creditors, neither the corporation nor
its assignee, for the benefit of creditors ,can lawfully sue for
more.   In the present case it appears from the record, that
if all٭the dishonest claims were thrown out, it would not
require the whole of the defendant's subscription to satisfy
the claims of honest creditors, but the trustee must sue for
the *whole amount*, that being the *cause of action* conveyed
to him by the deed of trust.   He has no discretion in the mat-
ter, but is bound by the terms of the deed of trust, and in
suing upon the cause of action conveyed by it he must, wil-
lingly or unwillingly, give effect to the fraudulent object of
the deed.

*Edwin G. Baetjer*, for the appellee.

1. Purchases by directors of property in which they are
interested are not *ipso facto* void, but voidable only; they
are valid until avoided by the corporation.   This is directly
contrary to the defendant's contention; such transactions
are " not void until ratified, but voidable only and valid and
binding until properly avoided."   The proposition is sustained
by all authorities; thus it is stated :   *Clark on Corp.* , 513.
"Such transactions do not need ratification.   They are
binding until avoided."   *Thomas* v. *Brownsville, R. R.*, 109
U. S. 522.   To the same effect are :   *Barr* v. *N. Y. & L. E.
R. R.*, 125 N. Y. 263;   *U. P. R. R.* v. *Credit M. Co.*, 135
Mass. 367 at 376;   *Kelly* v. *Newberry, H. R.*, 141 Mass.
496, at 499.   It is conceded that neither the corporation
directly nor its stockholders have ever disaffirmed the pur-
chase of the land and the issue of the notes.   An illustration

of the necessity and reasonableness of the proposition announced is found in the application of the rules governing the right of the corporation to elect its remedies against its directors for transactions of this character.

The corporation may elect to submit, *Thomas* v. *Brownsville R. R.*, *supra*, or it may ratify the transaction and insist on and obtain the profits, or it may disaffirm it *in toto*. *McGuarke* v. *Toledo R. R.*, 146 U. S. 536. What election is to be made, or what course adopted, is a question to be decided by the corporation through its directors, if independent and not interested, or by the majority of the stockholders ; a single stockholder cannot make the election, nor can the Court make the election, the directors or majority of stockholders alone can do so ; it is their wish and their judgment alone which can determine it. *Foss* v. *Harbottle*, 2 Hare, 461, cited in *Shaw* v. *Davis*, 78 Md. 316, 317 ; *Booth* v. *Robinson*, 55 Md. 438. The defendant, Urner, cannot, therefore, make the election in opposition to the submission or acquiescence of the $650,000 of other stockholders, and the transaction stands as valid and binding.

2. If the purchase by the directors of the property in which they were interested is not to be considered as valid, because it has not been avoided, then it is valid, because it has been ratified by the company and by the defendant. In determining whether this transaction has been ratified, it must be borne in mind that corporations are bound by the same rules as to ratification and acquiescence as individuals. *Grape, etc.* v. *Small*, 40 Md. 395, at 400.

And a transaction of this kind " does not require any substantial act of ratification, but mere acquiescence is sufficient." *Kelly* v. *Newberry H. R.*, 141 Mass. 496, 499 ; *Twinn Lick Co.* v. *Marbury*, 91 U. S. 587 ; *Barr* v. *N. Y. & L. E. R. R.*, 125 N. Y. 263. In the case at bar the acts relied on to constitute ratification are more conclusive than in any of the cases cited.

The journal of the company and the minute-book in October, 1890, and January, 1891, contained a detailed state-

ment of the purchase by the vendors, and the notes issued. The public records of Roanoke disclosed the cost of the property to the promoters. The board of directors was, after October 10, 1891, disinterested; the majority of the stockholders were always disinterested. In October, 1892, the defendant knew of the fraud. In January, 1894, he voted by proxy. From 1890 to October, 1895, the company continued to hold the land, improving and selling parts; the sales in 1892 and 1893 alone aggregating nearly $500,-000, and were at the rate of $3,000 per acre. These facts, if they do not establish a ratification, are at least facts from which the jury were at liberty to find it. *Martin* v. *South Salem Land Co.*, 94 Va. 53. The defendant's third and fourth prayers attempt to withdraw this evidence from the consideration of the jury as insufficient, and are therefore bad.

McSHERRY, C. J., delivered the opinion of the Court.

This is a suit by the trustee of an insolvent foreign corporation to recover from a stockholder the unpaid balance due on his subscription to the capital stock. The Roanoke Development Company of Virginia, after a brief career, made an assignment to the appellee for the benefit of its creditors. The company was one of the many ephemeral and speculative concerns, which, a few years ago, suddenly sprang into existence throughout portions of Virginia and Maryland, and perhaps elsewhere, and deluded the credulous and confiding by the promise of fabulous gains, and frequently misled the conservative and cautious to believe that obscure localities would, under their stimulating influence, speedily grow into permanent and important centres of commercial and manufacturing activity. It soon went the way of all such ventures and hopelessly collapsed. Amongst the assets which the deed of trust conveyed were the appellant's and other unpaid subscriptions. To the declaration filed in the cause, in addition to the general issue, there was a plea by way of equitable defence which

raises the material question to be disposed of on this appeal. The deed of trust is peculiar in that it sets forth specifically the indebtedness due by the company, and for the payment of which this and other like collections from stockholders are being made. An outline of the prominent facts will disclose the precise nature of the controversy.

The Roanoke Development Company was organized in eighteen hundred and ninety. It issued a prospectus in which it was stated that the company proposed to purchase thirteen hundred acres of land adjacent to Roanoke; that the capital stock was one million one hundred thousand dollars, of which five hundred thousand dollars are "for the purchase of the property." There were eight directors of the company, five of whom were residents of Roanoke, and three resided in Philadelphia. Terry, Jamison, Simmons, Sands and Gale were the Roanoke directors. In September and December, 1888, February, 1889, and March and June, 1890, Terry acquired sundry parcels of land for the aggregate sum of $37,600. On October the eleventh, eighteen hundred and ninety, Terry, who was the father-in-law of Jamison, conveyed this same property to Jamison for the consideration of one hundred and seventy-five thousand dollars, part of which was alleged to be cash, and part the promissory notes of the purchaser. The deed was acknowledged on November the twenty-fifth, 1890. On the same October the eleventh, Jamison and wife conveyed this same property to the Development Company for a consideration of two hundred and seventy-five thousand dollars. The deed was acknowledged December the twenty-first, 1890. Thus, property which had cost Terry, a few months before, only $37,600, and which he had not fully paid for, was turned over to Jamison at a profit to Terry of $137,400; and on the same day was turned over to the company at a profit to Jamison of $100,000. The whole of this consideration of $275,000 (except $30,201.29, which was cash), was made up of the company's promissory notes to Jamison for $87,306.05, and of Jamison's notes to Terry

for $139,201.29, which had been given by Jamison to Terry for this very same land, and the payment of which the company assumed, and also of something over $18,000 of Terry's notes to the parties from whom he had purchased this same land, the payment of which was likewise assumed by the company.    On October the eleventh, 1890, Jamison and Simmons conveyed to the company another parcel of land in consideration of $100,000.    This land they acquired from Terry on March the first, 1890, for $23,500.    On October the seventeenth, 1890, Routt and Dennison conveyed to the company another parcel of land for $125,000. The land belonged to Routt.    Dennison had an option on it for $81,000.    Less than a year before, Routt had purchased the same property for $13,600.    Dennison's share in this transaction amounted to $43,123,50.    Routt received in cash $10,234.74.    Thus, land which had cost these directors and promoters something over $70,000, was turned over to the company by them for $500,000, some of which consideration was paid in cash, but much the larger part either in notes of the company, or in notes given by some of these directors to other directors, and of which the company assumed the payment.

These transactions, by which the directors and promoters secured to themselves an enormous profit at the expense of the stockholders, whose interests they were bound to protect and were forbidden to betray, were gross and glaring acts of fraud which nothing can justify or excuse, and which no attempt has even been made to palliate.    Subscriptions obtained to the capital stock of the company, when the subscribers were ignorant of these reprehensible deals, and when they were, in addition, assured that there was no promoters' fund or advantage, were subscriptions obtained by fraudulent means and were revocable by the deceived subscribers, if rescinded by them whilst the company was a going concern, and within a reasonable time after the discovery of the fraud.    *Wenstrom, &c., Co.* v. *Purnell*, 75 Md. 113.    This proposition had been so often announced that it may be re-

garded as finally and definitively settled; and we do not un-
derstand that it is either questioned or denied.    An effort
to rescind the contract of subscription was made.    The facts
upon which its legal sufficiency depended were referred to
the jury under appropriate instructions, and they have been
found against the stockholders, and there is, therefore, no
question of that kind to be considered on this appeal.

But fraudulent transactions like these may not only affect
the liability of the subscriber to the company on his con-
tract of subscription, but they are voidable as between the
guilty director and promoter, on the one hand, and the com-
pany and its shareholders, on the other.    Whilst the share-
holder may have lost, by his laches or by his acquiescence,
the right to rescind his contract of subscription on this
ground, and may, in consequence, remain liable to pay his
subscription when lawfully demanded; still such dealings
between directors and the company of which they are direc-
tors, for their own personal gain and in violation of the
trust which their positions impose, are voidable unless rati-
fied by the company.    If they are fraudulent they are void-
able because fraudulent (*Brantly on Contracts*, 158); and it
comes to the question whether, when a stockholder is sued
by the company or by a trustee, standing in the place of the
company, to recover his unpaid subscription, and he has lost
the right to rescind his contract of subscription, he may suc-
cessfully resist the demand, if the voidable contracts between
the company and its directors have not been disaffirmed,
and if the purpose of the suit against him is to collect
money from him, which is to be appropriated in part to the
payment of the very obligations given by the company to
the directors in execution of the voidable contract?    Can
he, when thus sued, disaffirm the voidable contract between
the company and its directors, and thereby nullify the obli-
gations so given by the company to its directors, and defeat,
altogether, a recovery against himself, even though some of
the claims, towards whose partial payment this unpaid sub-
scription, when collected by suit, would be applied, are claims

unaffected by and not growing out of the fraudulent conduct of the directors?

This presents an inquiry as to the effect of a voidable contract of the character of those under consideration. Is it inoperative unless ratified? Or, is it operative unless disaffirmed? The doctrine on this subject is as well stated in *Thomas* v. *Brownsville R. R.*, 109 U. S. 522, following *Twin Lick Co.* v. *Marbury*, 91 U. S. 587, as anywhere else: "Such contracts are not absolutely void, but are voidable at the election of the parties affected by the fraud. It may often occur that, notwithstanding the vice of the transaction, namely, the directors or trustees, or a majority of them, being interested in opposition to the interest of those whom they represent, and in reality parties to both sides of the contract, that it may be one which those whose confidence is abused may prefer to ratify or submit to. It is, therefore, at the option of these latter to avoid it; and until some act of theirs indicates such a purpose, it is not a nullity." Whilst an utterly ineffectual attempt to ratify these sales was made by the board of directors on the nineteenth of January, 1891, there is no pretence that either the corporation through its directors, or its stockholders, ever disaffirmed or repudiated them. This being so, and these contracts being voidable, by whom can they be avoided? Obviously only by one of the parties to them. As the party who has been guilty of the fraud cannot rely on his own bad faith and misconduct to annul the obligation he has incurred under the voidable contract, it follows that the other, or defrauded party, alone can disaffirm. In this instance that party is the company. It comes then to the question, how can the company act? Generally speaking, the right to disaffirm cannot be exercised by the stockholders separately, but it must be exerted collectively; because there cannot be both an affirmance and a disaffirmance of one and the same transaction, and this might readily result if one stockholder had the power to disaffirm and another an equal power to affirm. The power to disaffirm

is contained in the power to affirm. If it pertains to one stockholder, acting for himself, it pertains to every other one as well. If one, acting for himself, should disaffirm and another should affirm, precisely opposite results would be attained, and both would be equally binding, not merely as respects the particular stockholder so disaffirming or affirming, but as respects the corporation ; because it is the *thing* —the contract—that is disaffirmed or affirmed, and not the mere personal relation of the stockholder to it. As a consequence, if the *thing* could be thus both affirmed and disaffirmed, the anomalous situation would be presented of one and the same contract being alike inoperative and effective, at one and the same time, with reference to one and the same transaction. If one shareholder, owning a single share, cannot bind the corporation by a ratification of such a contract —and he cannot unless his act be the act of the company—it is difficult to see how the power to disaffirm, which is no greater or more extended than the power to ratify, can be availed of by the same stockholder to strike down, for his individual benefit, a contract which the majority of stockholders may have acquiesced in or may have precluded themselves from disturbing.

Of course we do not mean to question, by anything we have said, the doctrine followed in *Davis* v. *Shaw*, 78 Md. 316. A minority stockholder may undoubtedly invoke the aid of a Court of Equity by a bill of complaint when the corporate transaction assailed is *ultra vires*, illegal or fraudulent ; and upon satisfactory proof the Chancellor may strike down the contract and restrain its execution. The relief granted in such a case would be affirmative relief. The plea by way of equitable defence, in the case at bar, seeks to substitute an election by a single stockholder to disaffirm, for a decree of a Court of Equity annuling a voidable contract. But we are dealing with the power to *disaffirm* and not with the right *to appeal to a Court of Equity* to procure the annulment of a fraudulent contract by a decree. One

is the act of a party ; the other is the act of a Court of Justice.    The two things are essentially different.

Bearing in mind that the transactions denounced are only voidable, and therefore do not need ratification to make them valid, it is obvious they are binding until properly avoided. It must be a *corporate* act that avoids them, if they are avoided by a disaffirmance, and not by a decree ; and that corporate act must be done either by the directors or the stockholders.    All corporate action must be taken by at least a majority of those who are authorized to act for the corporation—whether they be directors or stockholders— and as a disaffirmance—not a judicial annulment—of these contracts could only have been effected by corporate action, it could only have been accomplished by the action of a majority of the directors or stockholders.    '' The rule is that the majority governs, and every stockholder contracts that such shall be the rule.''    1 *Mor. Cor.*, sec. 474 ; *Hart* v. *Ogdensburg & L. R. R. Co.*, 89 Hun. 316.    This is the pivotal point of the case.

Now, whilst the deed of trust includes, amongst the claims to be paid some of the notes given by the company in consideration of these sales by the directors to it, there are also enumerated other debts,.which are not tainted in the same way.    Some of these notes are apparently in the hands of the original payees ; some have gone into the possession of other holders, and part of the indebtedness, for the payment of which the deed provides was, according to the evidence in the record, incurred for money borrowed by the company from other parties.    The rights of these alleged innocent holders are not before us, and were not and could not have been before the trial Court.    As to them it is obvious, if the stock subscription has not been rescinded, the liability of the stockholders is unimpaired by any fraudulent dealings between the directors and the company, for the unpaid subscriptions are a trust fund for the payment of debts. *Rider* v. *Morrison*, 54 Md. 429.    And, as to the original payees, *their* right to participate in the fund depends, not

upon the nature of their contract, that is, not upon whether it was a contract that might have been, but was not, disaffirmed, but upon whether there is a contract that is still subsisting, because it has not been disaffirmed by the only party who could disaffirm it, or has not been annuled by judicial decree.

Though one of the objects designed to be accomplished by the deed of trust was the ratable distribution of the assets amongst all the creditors, including the holders of the notes given in execution of these voidable transactions ; it cannot be said that the deed " by its terms may operate as an instrument in aid of the fraud," (*Farrell* v. *Farnan*, 67 Md. 81), because, confessedly, there are claims which are free from any suspicion of fraud and which the deed directs to be paid ; and, because, even those growing out of these sales are dependent on contracts which were merely voidable and have not, so far as the record discloses, been avoided, and are, therefore, still obligatory.  In a word, the whole question comes back to the proposition that a voidable contract of this character is not a void contract, but is "binding until avoided."  *Clark on Corp.*, 513.

With these observations, we come to the rulings on the prayers.  The plaintiff's *second* and *third* prayers and the defendant's *first* (all of which were granted) submitted to the jury the question, whether after the discovery by the defendant of the fraud, by the practice of which he had been induced to subscribe to the company's capital stock, he rescinded his subscription in a reasonable time.  These instructions are free from error.  The defendant's *second* prayer proceeds upon the theory that if the fraudulent and voidable sales made by the directors to the company " were never submitted to the stockholders of said company for ratification," and if the trustee named in the deed of trust had knowledge of these transactions and accepted the deed, " for the purpose of enforcing the same against the stockholders,  *  *  *  the deed of trust is void."  But the vice of the prayer lies both in the premise and in the con-

clusion. It is erroneously assumed in the former, that a failure to submit these voidable sales to the stockholders for ratification, of itself, operated to avoid the sales, whilst precisely the converse, that a voidable contract is valid until disaffirmed, is the rule ; and in the conclusion it is asserted that the deed of trust is void because these voidable contracts were not ratified and because the trustee accepted the deed with a knowledge of the circumstances attending the consummation of those sales. The conclusion, that the deed of trust is void, is again faulty, because it disregards the principle thus stated in the appellant's brief, "that the mere presence of fraudulent claims, along with honest ones, in a deed of trust need not invalidate the deed." The voidable contracts of sale, and the deed of trust are distinct and different acts, and their validity must be determined according to their respective merits. The making of the previous fraudulent contracts did not deprive the corporation of the right to make a deed of trust of all its property for the equal benefit of all its creditors. *Horwitz, Garnishee,* v. *Ellinger,* 31 Md. 492. The defendant's *third* prayer was wrong, because it assumed as a legal postulate, that no valid sale of land could be made to the company by its directors, unless the purchase was either authorized or ratified by *all* the stockholders. The contention that the contract could not be ratified except by unaminous consent of *all* the stockholders cannot be maintained. That principle does not apply to acts which might have been authorized by a majority in the first instance. *San Diego, &c.,* R. R. Co. v. *Pacific Beach Co.,* 112 Cal. 53 ; S. C., 33, L. R. A. 788. Such a sale would be voidable, and as we have seen, a voidable sale is valid until disaffirmed—it is not invalid until ratified. The same fault is the basis of the *fourth* prayer, for this prayer asserts that the purchases by the company from its directors were not purchases of land within the terms of the prospectus, because there is no legal evidence that such purchases were authorized or ratified by the corporation. This,

as we have pointed out, is precisely the converse of the true doctrine.

This is not a case where stockholders are seeking redress against delinquent directors as in *Booth* v. *Robinson*, 55 Md. 419 ; nor can the plea by way of equitable defence confer upon a Court of Law the jurisdiction of a Court of Equity. *Taylor & Bradford* v. *State, use of Miller*, 73 Md. 222. In such a plea, under *Sec. 83, Art. 75 of the Code*, the facts pleaded must show a case where a Court of Equity would restrain the execution of the judgment ; and accordingly it has been held that the defendant in an ejectment proceeding could not plead that the deed under which the plaintiff claimed, had been executed in fraud of the rights of the creditors under whom defendant claimed, because the remedy of the defendant was to have the conveyance set aside in equity. *Williams* v. *Peters*, 72 Md. 584.

The verdict and judgment in the Baltimore City Court were rendered in favor of the plaintiff, the trustee, and against the defendant stockholder for the amount of the unpaid balance due on his subscription to the capital stock. We find no errors in the rulings of the trial Court. We cannot conclude this opinion without condemning in the strongest terms the culpable and atrocious fraud practised upon the appellant to induce him to become a stockholder ; and but for the fact that the jury have declared he failed to repudiate the subscription in a reasonable time after discovering the deceit, he would be released from all liability. As the case now stands, however, we are obliged to affirm the judgment.

*Judgment affirmed with costs.*

(Decided June 20th, 1899).