# ELMER C. WILLIAMS *v.* SALISBURY ICE COMPANY.

[No. 42, October Term, 1938.]

*Decided January 11th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, MITCHELL, and SHEHAN, JJ.

*Frederick W. C. Webb,* with whom were *Joseph Y. Gunby* and *Woodcock, Webb, Bounds & Travers* on the brief, for the appellant.

*L. Claude Bailey* and *Seymour O'Brien,* with whom were *Miles, Bailey & Williams* and *Miles & O'Brien* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The appeal in this case is from a decree of the Circuit Court for Wicomico County, Maryland, sitting as a court of equity, passed on the 18th day of February, 1938, dismissing the amended bill of complaint of the appellant, the owner of 100 shares of the outstanding voting common stock of Salisbury Ice Company, a body corporate of the said State of Maryland, the appellee.

The bill of complaint, as amended, in substance alleges that the said company owns and operates plants and properties located in the City of Salisbury, for the manufacture and sale of ice, and for cold storage purposes, and that for many years past it has been engaged in retailing its product direct to consumers in the City of Salisbury

and adjacent territory, and in selling the same at wholesale for the purpose of icing railway refrigerator cars and the storage of commodities under refrigeration.

It further alleges, as is conceded by the answer of the corporate defendant, that the issued and outstanding capital stock of said defendant consists of 550 shares of voting common stock, of the par value of $100 each, 285 shares of non-voting common stock of like par value, and 491 shares of seven per cent non-voting cumulative preferred stock of the par value of $50 per share.

That on or about April 4th, 1936, one William F. Messick, who at that time was president, treasurer, general manager, and the whole or controlling owner of the capital stock of the W. F. Messick Ice Company, a corporation which was engaged in the same line of business as that in which the defendant was engaged, and was a strong competitor of the latter, for the fraudulent and illegal purpose, and with the fraudulent and illegal object, of obtaining control of the management of the defendant, and by that means make the defendant subservient to the interest of the W. F. Messick Ice Company, and thereby eliminate competition between the defendant and the Messick Company, and otherwise benefit the latter company at the expense and loss of the defendant, acquired control of a majority of the outstanding voting common stock in the defendant company. In line with this alleged fraudulent design, it is asserted by the plaintiff that on April 4th, 1936, the said William F. Messick caused Paul E. Watson, S. Franklyn Woodcock, Thomas N. Potts, Jr., Charles H. Watson, Dorothy P. Taylor, and Elmer C. Williams, the latter being the complainant, to be removed as directors of the defendant company, and the said Paul E. Watson, S. Franklyn Woodcock, and Thomas N. Potts, Jr., as officers of said defendant, to be also removed as such officers. It is then set forth by the plaintiff that the said William F. Messick thereupon caused to be elected in place of the removed directors, in addition to himself, Jesse D. Price, Levin Claude Bailey, E. Homer White, Sallie A. Price, and Ruth

P. Woodcock, and that, following their election, the latter directors elected in place of the removed officials the said Jesse D. Price as president, E. Homer White as vice-president, William F. Messick as treasurer and general manager, and Levin Claude Bailey as secretary. These directors and officers, it is alleged, were respectively re-elected at the annual meeting of the stockholders of the defendant held on November 18th, 1936, with the exception of Sallie A. Price and Ruth P. Woodcock, in whose places George O. Hendrickson, Jr., and John G. Melson, both of whom at that time, and at the time of the filing of the bill of complaint, were employees, directors and stockholders of the Messick Ice Company, were elected.

Specifically, the amended bill of complaint alleges that in furtherance of the fraudulent design of the said William F. Messick, since his procurement of the control of the defendant company, the business and affairs of the latter corporation have been grossly mismanaged and conducted, and its assets have been misapplied under his domination without any interest in its corporate welfare, in utter disregard of the rights of its creditors and stockholders, and solely in the interest of the said William F. Messick, individually, and the said W. F. Messick Ice Company, to the great loss, injury and damage of the Salisbury Ice Company. And in support of the next above allegation, the more serious items cited as representing an abuse of authority on the part of Mr. Messick are set forth as follows:

(a) The transfer of the retail ice business of the Salisbury Ice Company to the W. F. Messick Ice Company, and the purchase by the latter company of the delivery trucks and retail ice accounts of the former company, at a price which it is contended was grossly inadequate. Under the terms of this sale, the Messick Company agreed with the Salisbury Company to assume sole control of the latter's retail ice business, and to purchase one-half of the manufactured ice, used by the former company in supplying the combined retail ice trade of both companies, from the Salisbury Ice Company, at

prices agreed upon between the managers of the two companies, which latter agreement, it is alleged by plaintiff, was violated by William F. Messick.

(b)   That in the course of transactions between the two companies, growing out of the above agreement, it developed that more ice was supplied for the purpose of said retail trade, by the Salisbury Company, than by the Messick Company, during the first year in which the above arrangement was in effect, and that the said William F. Messick, in his capacity as general manager of both companies, arbitrarily and without advising with any other official of the defendant company before doing so, caused the Salisbury Company to pay the Messick Company the sum of $3981.27, as a purported refund for 995 tons of ice sold and delivered by the former company to the latter company, for retail consumption; the transaction resulting in a discrimination against the Salisbury Company to the extent of the above payment, and, unadjusted, in effect representing a total loss to the extent of the wholesale price of 995 tons of ice, to the Salisbury Company, and a total gain, to the same extent, to the Messick Company.

(c)   The alleged payment of counsel fees incurred by William F. Messick in his successful effort to gain control of the Salisbury Company, and due by him individually, out of the company's funds.

(d)   The alleged employment of workmen on the regular pay roll of the Messick Company, in part time service with the Salisbury Company, at times when these workmen were not needed in the service of either company, to the end that the loss incident to lack of work for said employees might be borne by the latter company.

(e)   Failure to adjust and pay to the Salisbury Company unexpired casualty and fire insurance premiums, and unexpired motor license charges, on the trucks purchased by the Messick Company as above set forth.

And, finally, the remaining specific charges of mismanagement and abuse of authority on the part of Mr. Messick as an official of the Salisbury Company, are con-

cerned with an overpayment on an increase in his salary, which was made retroactive and authorized by the board of directors of the company; the unfair exchange between the two companies of storage ice of inferior weight and quality, for tank or newly manufactured ice of superior weight and quality; the alleged diversion of cold storage trade from the Salisbury Company to the Messick Company, through the activities of William F. Messick, based on information gained by him through his access to the books and records of the former company, and the general charge that the management of the Salisbury Company under Mr. Messick is so directed as to result solely in his personal interest and in the interest of the Messick Ice Company, to the great loss, damage and injury of the Salisbury Company, and its creditors and stockholders.

In his prayer for relief, the complainant seeks the appointment of a receiver to take charge of the assets and business of the Salisbury Ice Company, to the end that the same may be operated under the direction of the court in which the proceedings were instituted, until such time as the rights of creditors and stockholders of the corporate defendant may be permanently preserved, and for general relief in the premises.

The answer of the defendant corporation sets forth that for many years it has been engaged in the manufacture and sale of ice, and in the business of icing refrigerator cars and the operation of a cold storage plant; but denies that the retail sale of ice to consumers was other than a minor branch of its operations, and asserts that the sale of its equipment for the conduct of its retail business was effected in its interest, because the retail sale of ice was becoming unprofitable to the company.

It then asserts that, on November 20th, 1935, the board of directors which the amended bill of complaint alleges was subsequently, on April 4th, 1936, removed, was illegally elected; and that, during the period of approximately four and one-half months in which that board held office, the defendant corporation was involved in

litigation relative to the membership of the board and the election of officers of the corporation; its business and affairs were not profitably conducted by said directors and officers. It denies that William F. Messick acquired control of the voting common stock for the fraudulent purposes set forth in the amended bill of complaint, and asserts that on April 4th, 1936, when a new board of directors and new officers of the defendant company were elected to succeed the former and alleged illegally elected board of directors and officers, he did not, as a matter of fact, personally own the controlling interest in said voting common stock of the defendant, it being, however, admitted in the answer that, at the time of the filing of the same, the said Messick was the registered holder of 290 shares of said voting common stock.

Finally, in substance, a general denial of every vital allegation found in the amended bill of complaint is asserted in the answer; and, among other things, it is submitted therein that no loss, whatever, has been sustained by the defendant corporation, as a result of mismanagement of its business affairs, or the misapplication of any of its assets, on the part of William F. Messick; and that the defendant corporation is not under his domination and control. It is further submitted that such losses as the defendant corporation did sustain during the fiscal year ending October 31st, 1936, as reflected in its annual statement, "were very largely and almost entirely due to very substantial litigation expenses brought about by the illegal attempt to elect a board of directors on November 20th, 1935, and the subsequent efforts of said illegally elected board to place in office, officers and a general manager and to retain management and control of the corporation illegally, all at the great expense and to the great detriment of the corporation." And it is asserted in the answer that the defendant is a solvent corporation, without any need, whatever, for the appointment of a receiver for the protection of its assets, in the interest of its creditors and stockholders.

The record in the case before us is unnecessarily vo-

luminous. It embraces seven hundred and forty pages of printed matter, the greater part of which consists of testimony of which a substantial proportion might well have been eliminated. We are, therefore, in accord with an observation to the above effect found in the opinion of the learned chancellor who heard the case below.

Reduced to its final analysis, it appears from the record that the defendant corporation was organized thirty-one years ago, the moving spirit in its incorporation being one Jesse D. Price, who throughout the years since the company began operations, with the exception of the brief interval from November 18th, 1935, to April 4th, 1936, has been a director and officer of the organization. At times, in addition to his position as president or executive officer of the defendant, Mr. Price has filled the important positions of general manager and treasurer, and over a period of many years the record shows that the corporate defendant, under his management, was a prosperous and successful organization. No stronger justification of this observation need be cited than the following excerpt from the record, which was not disputed by the sole complainant in this case: "Q. Mr. Price, do you know how long the complainant in this case has owned common stock in this company? A. He subscribed for it in 1907 when the company was organized. Q. Ninety-four shares? A. Yes sir. Q. For which he paid how much per share? A. Par, one hundred dollars. Q. Have you made any memorandum from the original records of the company, as to the amount of dividends that the complainant has received on that stock during the years that he owned it? A. Yes sir. Q. And what is the aggregate amount of dividends that have been paid him on his ninety-four shares of stock, or $9400 investment? A. He has received $32,695.08 or $11\frac{1}{4}$ per cent for the whole thirty-one years."

On the other hand, it is proper to note that, while the average dividend paid common stockholders is as above indicated, no dividend has been declared by the directors of the company since 1931, and meanwhile its net profits

have greatly decreased. The record is replete with transactions evidencing the involvement of the defendant company with the purely personal financial difficuties of Mr. Price, and it is apparent that this circumstance is not conducive to the best interests of the defendant and its stockholders. This situation has resulted in the pledge of the company's credit for the personal indebtedness of its president and former general manager, who at times was also its treasurer, and at all times drew a lucrative salary from the defendant corporation, but little of which was exacted from him, on account of his indebtedness to the company, by his co-directors. Mr. Price has meanwhile taken up his abode in Baltimore City, far remote from the scene of his activities as executive head of the defendant company.

From a large stockholder, his interests in the company are now practically negligible, and even the small block of stock in the defendant corporation yet remaining in his name is pledged as collateral for a part of his comparatively burdensome indebtedness.

Doubtless the above transactions between Mr. Price and the defendant corporation, of which, then as now, he was the executive head, acquiesced in by the then directors of the company, was at least one of the reasons which actuated the complainant in this case to endeavor to seize control of the corporation at the annual meeting of the voting stockholders of the defendant on November 18th, 1935. But apparently that was not the only reason which caused him to take action on that occasion, because the uncontradicted evidence of Mr. Price is to the effect that the complainant, prior to November 18th, 1935, and when a contest for the control of the directorate of the corporation was imminent, sought the then president, offered to sell his stock for $150 per share, and later suggested an alliance with Mr. Price for the control of the corporation, upon condition that a son-in-law of the complainant be appointed as treasurer of the corporation, in place of Thomas N. Potts, Jr., who, significantly, was one of the board of directors which the com-

plainant and his associates elected at the time they did assume control of the affairs of the defendant company.

Moreover, for the purpose of wresting control of the company from Mr. Price and his associates in November, 1935, it is frankly admitted by the complainant that he pursued an "unethical" course by purchasing ten shares of unissued voting common stock from the treasury of the corporation, thereby precipitating the litigation in which the company has been since continuously involved, and in which he, the complainant, has been a continuous participant.

At the expense of prolonging this opinion, we have here detailed the various phases which have resulted in the present controversy, to the ultimate loss and serious detriment of all the stockholders of the defendant corporation. And it may be here observed that the record portrays an unfortunate situation, in which the acknowledged executive officer of the corporation is hopelessly involved in indebtedness to it and to others, and its general manager, regardless of his motives, however free from personal gain and selfishness they may be, is the active head and practical owner of an established and apparently prosperous company, which for some years past has been a formidable competitor of the Salisbury Ice Company.

Notwithstanding this situation, however, it should be borne in mind that although Mr. Messick and two other members of the directorate of the defendant corporation are also directors of a competing company, that fact, standing alone, will not justify the relief prayed, unless the fraudulent design and purpose charged in the amended bill of complaint is clearly established. For while it is not denied in the answer of the defendant that Mr. Messick did over-pay his own salary, and that he caused the Salisbury Ice Company to pay the Messick Ice Company for ice manufactured by the former, both of which transactions, had they remained undiscovered and unadjusted, would have resulted in a loss of over $4200 to the defendant corporation, it is well settled

that the mere circumstance that three of the defendant's board of directors are also directors of the competing corporation, in itself does not afford sufficient ground of presumption against the legality and fairness of the above, or any other transaction between the two companies. In other words, while actual fraud will affect the result in any case, the fact that two corporations have common directors does not of itself invalidate a transaction between them. *France, Principles of Corporation Law* (2nd Ed.), sec. 65.

Both companies were competent to contract, the one with the other, and the three directors who were members of both boards owed, and still owe, the solemn duty to be faithful to both alike. Under the facts in the instant case, the conduct of Mr. Messick, largely interested financially, as he is, in both corporations, is the subject of the rigid scrutiny of the court. The amended bill of complaint is specifically directed against his conduct in transactions with the defendant corporation, but the question before us is not whether he has business interests which could be exercised in conflict and with injustice to the defendant company, but whether, in spite of his other capacity as practical owner and as general manager of a competing corporation, he has acted in good faith in his individual and official dealings with the defendant corporation.

Unwise and indiscreet management on his part, due to mistakes of judgment or mere default, would not be sufficient to grant the relief played. There must be proof of fraud, and the onus of that proof is upon the complainant. *Booth v. Robinson,* 55 Md. 419; *Pocomoke City National Bank v. Crockett,* 145 Md. 435, 125 A. 712.

The record shows that some time before Mr. Messick, at the solicitation of Mr. Price, purchased any stock in the defendant company, the question of the advisability of discontinuing the retail sale of ice by the Salisbury Company was discussed, and that in his annual report Mr. Price had suggested the advisability of such action. Negotiations to that effect were had with Mr. Messick,

but they did not materialize. At the time Mr. Messick became a stockholder and active figure in the affairs of the defendant corporation, they were further discussed, resulting in a sale of the retail delivery equipment of the defendant to the Messick Company, the sale of its retail ice accounts, and an agreement by which the Messick Company would purchase one-half of the manufactured ice, necessary to supply the retail trade of both companies combined, from the defendant corporation. This latter transaction, it is urged, combined with the items of over-payment in salary collected by Mr. Messick, and the collection for excess ice furnished by the defendant company under the above agreement, form the more important grounds for this suit. It is contended by the appellant that the sale price of the equipment was grossly inadequate, and that the sale price of the open accounts was likewise inadequate. But there is no proof to show that such was the fact in either case. To the contrary, there is evidence in the record that the equipment was not sold until after it had been separately appraised by two men engaged in the automobile industry, neither of whom were in anywise connected with either the vendor or the vendee. Their estimates, respectively, of the value of the equipment were $1700 and $1725, and the agreed sale price $2000, which according to the testimony was arbitrarily arrived at between the managers of the two companies, in order to embrace an adjustment for unexpired license fees and insurance premiums, then outstanding on the equipment sold. The aggregate open retail ice accounts of the Salisbury Company were discussed by Mr. Price and Mr. Messick, resulting in a sale of them for the sum of $500. The testimony of Mr. Price tends to show that, after eliminating retail ice accounts, definitely known to be worthless, the books of the defendant company showed accounts possibly collectible in the sum of $900, and that, allowing for additional bad accounts, the sale price was fixed at $500. Bearing upon the value of the accounts so sold, Mr. Messick testified that at the time of the trial of this case below he had

collected but $463 on the purchased accounts, and that while he might collect a few dollars more, the amount would be nominal.

As has been indicated, a number of minor alleged irregularities in the conduct of the affairs of the defendant company are charged in the amended bill, but as a careful examination of the testimony leads to the conclusion that they represent only differences of opinion in the method of corporate management, rather than fraudulent design, they will not be discussed by us in detail.

It is uncontradicted that the over-payment on his salary account and the erroneous collection by the Messick Company for ice which it admittedly did not furnish for retail trade, have been adjusted and refunded to the defendant corporation, but it is contended by the complainant that these adjustments and refunds were not effected until after the original bill of complaint in the instant case was filed; and these circumstances, it is urged, furnish grounds for the assumption of actual fraud or fraudulent design on the part of Mr. Messick. On the other hand, it is admitted that the items appeared in the annual statement of the company, that no attempt was therefore made to conceal them, and that when the errors were pointed out to Mr. Messick and he was convinced that they existed, he promptly adjusted them, and refunded to the treasury of the defendant the amounts in question. It is also admitted by the complainant that, in an interview with Mr. Messick after the annual statement was in the hands of the stockholders of the defendant company, he, the complainant, did not attempt to seek an explanation of the items, which action might have resulted in their correction, then and there, but promptly instituted the suit from which this appeal is taken. Furthermore, that he solicited and received the release of his own individual ice account in the sum of approximately $145, thereby acquiescing, to that extent at least, in an alleged series of transactions which, upon the theory of his amended bill, form the basis of his charges of fraud and mismanagement in the conduct of the business of the defendant.

To summarize, the complainant is the sole minority stockholder who is a party to this appeal; and with no creditor involved in these proceedings, the court is asked to appoint a receiver to take charge and manage the affairs of a solvent corporation, under the court's direction, until the rights of creditors and stockholders may be permanently preserved.

In *Shaw v. Davis,* 78 Md. 308, 309, 28 A. 619, the general principle with reference to the rights of a minority stockholder is reaffirmed, and it is there stated that a court of equity will not intervene as to any action of either directors or stockholders of a corporation, at the instance of a minority stockholder, if the act complained of be neither *ultra vires,* fraudulent, or illegal. And that the fact that the acts complained of refer to dealings of such corporation with another corporation, or that the same person or persons are officers and hold a majority of stock in both corporations, while the plaintiff is neither officer nor stockholder in one of them, does not enlarge the jurisdiction of a court of equity to interfere. *Dailey v Wight,* 94 Md. 269, 276, 51 A. 38; *Urner v. Sollenberger,* 89 Md. 316, 333, 43 A. 810; *Supreme Lodge v. Simering,* 88 Md. 276, 288, 40 A. 723; *Du Puy v. Transportation & Terminal Co.,* 82 Md. 408, 426, 33 A. 889, 34 A. 910; *Sloan v. Clarkson,* 105 Md. 171, 66 A. 18.

In a word, if the question involved is one concerning the internal management of corporate affairs, void of acts *ultra vires,* fraudulent, or illegal, courts of equity will refrain from granting relief to a minority stockholder, or, as stated in *McDougall v. Gardiner,* L.R. 1 Ch.Div. 21 (cited with approval in *Shaw v. Davis, supra,* and *Davis v. Wright, supra*) : "Nothing connected with the normal internal disputes between the shareholders is to be made the subject of a bill by some one shareholder in behalf of himself and others, unless there be something illegal, oppressive or fraudulent—unless there is something *ultra vires* on the part of the company, *qua* company, or on the part of the majority of the company, so that they are not fit persons to determine it; but that every litigation

must be in the name of the company, if the company really desire it."

In the same case Mellish, L. J., after observing that very often in companies things are done which ought not to be done, proceeds: "Now if that gives a right to every member of the company to file a bill to have the question decided, then if there happens to be a cantankerous member, or one member who loves litigation, everything of this kind will be litigated; whereas, if the bill must be filed in the name of the company, then, unless there is a majority who really wish for litigation, the litigation will not go on. * * * Is it not better that the rule shall be adhered to that, if it is a thing which the majority are masters of, the majority in substance, shall be entitled to have their will followed?"

The power to appoint receivers is a discretionary one, which should be exercised with great circumspection, and unless it clearly appears that there is fraud, spoliation, or imminent danger of the loss of the property involved in the case if the immediate possession of the same is not taken by the court, jurisdiction should not be assumed in the premises. *Davis v. United States Elec. Power Co.*, 77 Md. 35, 40, 25 A. 982; *Steinberger v. Independent Loan & Savings Assn.*, 84 Md. 625, 36 A. 439.

Measured by the above standard, we cannot conclude that the facts in the instant case warrant the appointment of a receiver. For while, as has been indicated, the president of the defendant company has been permitted by its directorate, over a long period of years, to use its credit for his personal needs, it is also true that the indebtedness of the president to the company was contracted long before Mr. Messick became a stockholder, director, or officer of the corporation, and that it has not been increased since that time.

Furthermore, if the financial status of the president has meanwhile drifted into a condition which makes the full collection of the company's obligation against him doubtful, a receiver can collect no greater amount upon the same than can the company, acting through its duly constituted officials.

In conclusion it will be recalled that the appellant frankly admits that he pursued "unethical" methods to gain control of the company, and it will be noted that such action on his part was at least one, if not the only, cause which precipitated the extended litigation in which the company has since been involved, to its ultimate detriment and loss. One of his charges of mismanagement and fraud grows out of the cost of that litigation; and, defeated in his efforts to control the directorate and management of the defendant corproation through his own failure to control a majority of the outstanding voting stock, legally issued, he is asking a court of equity to intervene and thereby thwart the control of the majority stockholders. Under the facts in this case, this cannot be done and, for the reasons stated, the decree of the court below will be affirmed.

*Decree affirmed, with costs to the appellee.*