THE PENNSYLVANIA RAILROAD COMPANY ET AL.
*vs.* J. LIVINGSTON MINIS ET ALS.
J. LIVINGSTON MINIS ET AL. *vs.* THE PENNSYL-
VANIA RAILROAD COMPANY ET ALS.

*Corporations; ultra vires; directors; duties; sales of property
of corporations; discretion; ratification by
stockholders; presumption.*

In its proper sense the term *ultra vires* denotes some act or
transaction on the part of a corporation which, although not
unlawful or contrary to public policy if done or executed by
an individual, is yet beyond the legitimate powers of the cor-
poration, as they are defined by the statute under which it is
founded or which are applicable to it, or by its charter or acts
of incorporation.                                    p. 488

There is no presumption of illegality or unfairness in trans-
actions between two or more corporations, from the mere fact
that a portion of the board of directors of each constitute a
part of the board of the others and participates in the dealings
between the corporations.                         p. 485

The Union Railroad Company for a long time had owned and
operated a line of road which served as the necessary link in
connecting the Northern Central, the Philadelphia, Wilming-
ton & Baltimore and the Baltimore & Potomac Railroad
in and about the City of Baltimore. The Pennsylvania Rail-
road owned a large majority of the stock of two of the roads
and somewhat less than a majority of the stock of the North-
ern Central; the rate of tolls that had been established by
the Union R. R. having become exorbitant, a contract for the
sale of the stock as a road at par was obtained by the Penn-
sylvania R. R. The Northern Central R. R. was furnishing
nearly all of the traffic over the Union R. R., and the stock
was transferred to the Northern Central and paid for by it,

it being understood at the time by the directors of the several roads that the purchase was made for the benefit of all three connecting lines; subsequently the capital stock of the Union R. R. was doubled, and the new stock paid to the Northern Central R. R. as a stock dividend. In 1893 the Philadelphia, Wilmington & Baltimore R. R. Co. was contributing 42% of the traffic over the Union R. R., and the directors of the Northern Central sold to that road five-twelfths of the capital stock of the Union R. R. at par. At this time several directors were common to the boards of the several lines. The sale was ratified by the directors and reported to the stockholders as a sale made "in order to give the companies, contributing to the traffic of the Union R. R., an ownership therein based upon the amount of such contributions," but the consideration was not stated. As thus stated in the report and published in the newspapers, the sale was ratified by the stockholders. In the year 1910 certain minority stockholders of the Northern Central filed a bill against the Northern Central and the Philadelphia, Baltimore & Washington (the successor of the Philadelphia, Wilmington and Baltimore R. R.), and the Pennsylvania R. R., asking that the sale be set aside as fraudulent and *ultra vires; held,*

That the transaction was not beyond the corporate or statutory powers of the corporation or its directors.          p. 487

That under the evidence adduced the plaintiffs have failed to show fraud on the part of the directors.          p. 487

That there must be other than constructive fraud, and proof of the misconduct charged must be affirmative, going to establish fraud in fact.          p. 486

As the sale was ratified by the officers and directors and was further ratified by the stockholders through the adoption of the annual report, the stockholders, whether present or absent, were bound.          p. 487

Under all the facts of the case and in view of the published reports of the roads, the failure to state the price at which the stock was sold was not evidence of fraud.          p. 491

Where stockholders have every opportunity to know the details of a transaction consummated by the directors and rati-

fied by the stockholders, they must be presumed to have full knowledge of the same.                    p. 494

Where the principal actors to the transaction are dead and the records of all that transpired are inaccessible or lost, a Court of Equity will hesitate to disturb or inquire into a transaction which transpired many years (16 years) before.      p. 494

Where one party to a transaction has been permitted over sixteen years to rest under the belief that a transaction was regularly approved, and said party has made large expenditures under such belief, a Court of Equity will hesitate before setting it aside more than it might have done at or about the time of the transaction.                    p. 494

*Decided April 11th, 1913.*

Appeal from the Circuit Court of Baltimore City (HARLAN, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*George R. Willis, John J. Donaldson* and *John G. Johnson,* for the appellants.

*Arthur W. Machen, Jr.,* and *Wm. L. Marbury* (with whom was *Wm. A. Glascow, Jr.,* on the brief), for *J. Livingston Minis et als.,* appellees.

BOYD, C. J., delivered the opinion of the Court.

The bill in this case was filed by J. Livingston Minis and nine other stockholders of the Northern Central Railway Company against the Pennsylvania Railroad Company, the Philadelphia, Baltimore and Washington Railroad Company, the Union Railroad Company and the Northern Central Railway Company. The Philadelphia, Wilmington and Baltimore Railroad Company, and the Baltimore and Potomac

Railroad Company were consolidated as one corporation in the name of the Philadelphia, Baltimore and Washington Railroad Company, under the provisions of Chapter 478 of the Acts of 1902, and neither of them is a party to this bill under its original name.

The Union Railroad Company owns a line of railway running from a point on the Northern Central Railway at North street, in the City of Baltimore, east of Union Station, through what is called Union Tunnel, to tidewater at Canton, and also connects with what was formerly the Philadelphia, Wilmington and Baltimore Railroad at Bay View. In 1873 an agreement was made between the Baltimore and Potomac Railroad Company, the Northern Central Railway Company, the Union Railroad Company and the Western Maryland Railway Company, in which certain passenger and freight rates over the Union Railroad were agreed upon for those companies and also for the Philadelphia, Wilmington and Baltimore Railroad. That was somewhat changed by another agreement in 1875. The Baltimore and Potomac Railroad Company owned a railroad from Washington to Baltimore, and reached Union Station by using a part of the Northern Central tracks. The Western Maryland also connects with the Baltimore and Potomac near Fulton avenue, and runs on the tracks of the Baltimore and Potomac and the Northern Central in entering Union Station.

On February 14th, 1882, the Canton Company agreed with the Northern Central to sell the 5,940 shares of the Union Railroad stock owned by it at $100 per share, and to purchase and deliver the remaining 60 shares (there being 6,000 in all) at that price, if the holders would accept the price. That was done and the 6,000 shares were afterwards paid for and transferred to the Northern Central. The negotiations had actively begun in 1881 and there had been some intimation that if the Union Railroad could not be purchased an independent line would be built connecting the Northern Central, the Baltimore and Potomac and the Philadelphia, Wilmington and Baltimore, and giving the North-

ern Central access to large terminals it had built at Canton after the agreement of 1873. The Union Railroad was subject to liens amounting to $1,500,000.00,—making the purchase price equivalent to $2,100,000.00.

The Pennsylvania Railroad Company in 1873 became the owner of 48,240 of the 116,240 shares of the Northern Central then outstanding and still owned them in 1882; in 1881 it acquired by purchase a majority of the stock of the Philadelphia, Wilmington and Baltimore—having by June 16th of that year 217,819 of a total of 235,901 of shares of that company, and it owned the greater part of the stock of the Baltimore and Potomac Railroad Company. In 1887 a stock dividend of 6,000 shares was declared by the Union Railroad Company to the Northern Central as the holder of all of its original shares—making 12,000 shares of the Union Company outstanding, all of which were held by the Northern Central.

In 1894 the Northern Central sold to the Philadelphia, Wilmington and Baltimore 5,000 of the shares of the Union Railroad and received therefor $110.00 a share ($550,-000.00)—thus giving the P., W. & B. a five-twelfth interest and retaining seven-twelfths in the Northern Central. At that time the P. R. R. held 69,779 out of a total of 150,362 shares of the Northern Central, and since 1900 it has held a majority of the stock of that company. It held in 1894, 81,612 shares of the Baltimore and Potomac out of a total of 98,285 and 217,819 out of 236,387 of the P., W. & B. In 1896 there was a stock dividend by the Union Railroad Company of 75 per cent., of which the P., W. & B. was allotted 3,750 shares and large cash dividends were declared from year to year by the Union Company.

The plaintiffs contend that the sale of the 5,000 shares of the Union R. R. Co.'s stock to the P., W. & B. was at a grossly inadequate price, and that it was not believed by the directors that it was the real value of the same, but they "were actuated not by a desire to promote the interest of the Northern Central Railway Co., but by an intent to promote,

at its expense, the interests of the Pennsylvania Railroad Company through its subsidiary company, the Philadelphia, Wilmington and Baltimore Railroad Company," and they charge that the sale was not merely fraudulent in law, but was *ultra vires*.

The bill prays that a decree be passed declaring the sale of the 5,000 shares of stock in 1894 fraudulent, *ultra vires* and void; that the Philadelphia, Baltimore and Washington R. R. Co. be decreed and required to re-transfer to the Northern Central the 5,000 shares sold to the P., W. & B. in 1894, and the 3,750 shares allotted to the P., W. & B. in 1896; and that it also be required to account for and pay to the Northern Central all cash dividends received by it or its predecessor, the P., W. & B. R. R. Co., the Northern Central restoring to it the price paid for the 5,000 shares, together with interest thereon from the date of payment by the P., W. & B.; and that all such cash dividends paid to the P., W. & B. or to the P., B. & W. be decreed to be distributed and paid to the several shareholders of the Northern Central Railway Company.

The lower Court passed a decree substantially as prayed for, excepting it provided for five per cent. interest, instead of six per cent., on the dividends to be returned, and also on the $550,000.00 after the first year, and did not direct the amount recovered to be distributed and paid to the shareholders.

The P. R. R. Co., the P., B. & W. R. R. Co. and the Northern Central Ry. Co. entered an appeal from that decree, and the plaintiffs appealed from it, in so far as it omits or refuses to forthwith decree a distribution pro rata, among the stockholders of the Northern Central of the money received for the benefit of said company as a result of this suit, and in regard to the interest. The negotiations for the purchase of the stock of the Union Company were carried on by Mr. B. F. Newcomer, of Baltimore, at the instance of Messrs. George B. Roberts, President, and A. J. Cassatt, Vice-President. He was a director of the Northern

Central and became a director of the P., W. & B. on January 9th, 1882. Messrs. Roberts and Cassatt occupied those respective positions in the P. R. R. Co. and in the Northern Central.

The theory of the defense is, that when the 5,000 shares of the Union R. R. Co. stock were transferred to the P., W. & B. R. R. Co. the latter company was contributing about 41 per cent. of the business of the Union R. R. Co., and that it was understood at the time of the sale in 1882 of the 6,000 shares to the Northern Central, that the stock was eventually to be apportioned between it and the P., W. & B. R. R. Co., in proportion to the business respectively furnished by them. In a letter from Mr. B. F. Newcomer, addressed to "A. J. Cassatt, Esq., V.-P.," dated December 15th, 1891, he said: "Brooks of his own accord opened the subject to the Union R. R. which gave me an opportunity of impressing upon him the fact that your purpose was to construct at once an independent line to connect your two properties, and that no concession in tolls for the use of the Union R. R. no matter how great could ever be made satisfactory, and without troubling you now with all that passed between—I will when I see you give you full particulars, and I think chances are very good that something practicable may grow out of it." On December 22nd, 1881, Mr. Newcomer wrote a letter addressed to "Messrs. Geo. B. Roberts, Pres., and A. J. Cassatt, V. P.," in which he spoke of an interview with Mr. Brooks that morning in which he told him of their plan of running all freight destined for Canton by way of Port Deposit. Brooks said the Canton Company owned the property through which they would have to pass, and to his (Newcomer's) reply that if the Canton Company did not sell at a fair price its property could be condemned. Brooks said he would bring before the jury all the correspondence they had had with the Northern Central "to induce them to land the Union R. R. and that the measure of damages would be the value of the Union R. R.—as well as the property through which the tracks would pass—to this I replied that

the Northern Central Railway Co. and its *implied* promises
or *implied* obligations had nothing to do with it, as these
tracks would be branches of the P., W. & B., a different cor-
poration having no connection with the N. C. Ry. Co." Mr.
Brooks said he would feel it his duty to see that the Canton
Co. was compensated for the large outlay made by it in the
construction of the Union R. R. The letter goes on to say:

"I told him then that the only way to accomplish
that was to have an interview with his directors and
managers at the earliest date possible and offer you
the Union R. R. property at a price that would induce
you to take it off their hands, before it was rendered
useless."

The Canton Company, of which Mr. Brooks was president,
owned the Union Railroad Company, as well as a great deal
of property near Canton. Mr. Newcomer wrote to Mr. Cas-
satt on January 2nd, 1882, that Mr. Brooks had called on
him to say that it was impossible to get his New York direc-
tors at a meeting until after the holidays. On January 9th,
1882, Mr. Newcomer wrote to Mr. Cassatt that "this morn-
ing he (Brooks) called upon me with the enclosed letter,
and whilst it is much below anything he has yet named I
told him it would scarcely be entertained, but that I would
forward it for the purpose of ascertaining what Mr. Roberts
and you had to say about it." The letter from Mr. Brooks
bore the same date (January 9th, 1882) and began: "I am
directed to offer 'Union Railroad' for sale to the Pennsyl-
vania Railroad Company and associates (not to any other
party) for the sum of one million dollars subject to its
bonded debt of fifteen hundred thousand dollars." After
referring to the property, he concluded: "The causes that
lead to this offer you are aware of. The Canton Company
built the Union road and would expect in event of sale some
assurances as to general policy, that the same would not be
inimicable to her large interests." The record does not dis-
close the details of the transactions between the date of the

letter from Mr. Brooks and that of the final consummation of the sale. In a letter of January 19th, 1882, from Mr. Newcomer to Mr. Cassatt, after speaking of negotiations for lots at Canton near the elevator of the Northern Central, he concluded by saying: "I received Mr. Roberts' letter this morning and saw Brooks today but said little to him as it will take him a day or two to properly digest Mr. Roberts' views and to get over his idea that he is making a great sacrifice in offering the Union R. R. stock at $1,000,000." Mr. Roberts' letter was not introduced in evidence and hence we have no means of knowing what was in it. However, an agreement was entered into between the Canton Company and the Northern Central Railway Company on the 14th of February, 1882, by which the Canton Company sold to the Northern Central 5,940 shares of stock in the Union R. R. held by it at par ($100 per share), subject to existing mortgages of $1,500,000.00—the sale to take effect March 1st, 1882,—"at which time the voting privilege of said stock is to be transferred to the Northern Central Railway Company." Amongst other things, it was agreed that "The Northern Central Railway Company, as purchaser, their successors and assigns, *or whatever corporation or persons shall actually become the purchaser thereunder,* shall hereafter, as a condition of said purchase, execute such an agreement in detail as shall protect and in no manner oppose or conflict with the development and general business interests of the Canton Company." The Canton Company also agreed to deliver the other sixty shares at par providing the holders of said stock would accept the price. The agreement referred to was executed by the Northern Central, the Union Railroad and the Canton Company on April 13th, 1882.

In the annual report of the president of the Northern Central to the stockholders for the year ending December 31st, 1881, submitted at their meeting on February 23rd, 1882, he dwelt at some length upon the purchase. He said in part: "It may not be known to all the shareholders of

your company that, in order to enable your traffic to reach tidewater, and be interchanged with the Philadelphia, Wilmington and Baltimore Railroad at Baltimore, it was necessary to use the Union R. R., which was built to give your road connection with the property of the Canton Company at tidewater, and to form a connecting link with the Philadelphia, Wilmington and Baltimore R. R. and the Baltimore and Potomac R. R." He said that the contract between the Northern Central and the Union Railroad for the use of its road, made in 1873, was then considered reasonable and proper, but the great increase of tonnage and the low rates prevailing had made what was originally a fair contract a burdensome one. The board therefore deemed it necessary for the interests of the company, and the proper development of its traffic, that they should have their own line extended to tidewater. For that purpose they had careful surveys and estimates made, the result of which showed that it would be more advisable to acquire the ownership of the present line, if it could be had at a fair price, than to incur the expense and difficulty of the construction of a new line. Negotiations were accordingly opened on the part of the company with the Canton Company which resulted in the purchase. He said: "The gross earnings of the Union Railroad Company for the past year were $287,295.00; expenses, $61,324.00; net earnings, $225,971.00. Of the gross earnings your company paid $254,365.10. As the charges upon the traffic referred to were fixed by the contract, and as the traffic was steadily increasing, it will readily be seen that the purchase of this line must result in a large and direct pecuniary saving to your company, besides giving it what is essential to its interests—an absolute ownership of a line extending to tidewater, and a connection with the Philadelphia, Wilmington and Baltimore R. R., now owned and operated in harmony with your system."

At a special meeting of the directors of the Northern Central held on February 14th, 1882, the annual report of

the president was adopted and the secretary was directed to have it distributed to the stockholders and to present it at the stockholders' annual meeting to be held on February 23rd instant. It was resolved, "That the contract for the purchase of the capital stock of the Union Railroad Company, as negotiated by Mr. Newcomer, for and on behalf of this company, be approved", and that the thanks of the board be tendered to Mr. Newcomer. At the annual meeting of the stockholders on February 23rd, 1882, the action of the board was approved, and for the purpose of providing the means to pay for the capital stock of the Union R: R. Co., and for other purposes of the company, the board was authorized to increase the capital stock of the Northern Central to an amount not exceeding $6,500,000.00. Subsequent reports of the president and general manager from time to time referred to the ownership of the road, and there can be no doubt that it was purchased by the Northern Central, whatever interest any other company was understood by the parties to have in it. The stock stood in its name and the dividends, including a stock dividend in 1886 of 6,000 shares, went to it. None of those facts are denied by the defendants, and they were proven by the records of the company, as well as admitted in the answers of the defendants.

The defendants claim, however, that while all that is true, it was understood by the officers of the several companies that it was bought in the interest of the other companies under the control and management of the Pennsylvania Railroad Company, as well as in the interests of the Northern Central. Mr. George C. Wilkins was in 1875 superintendent of the Baltimore Division of the Northern Central from Baltimore to Marysville, Pa., of the Baltimore and Potomac and of the lines south of Washington to Quantico, Va. He continued in that position until April, 1882, when he was made superintendent of the Union Railroad, and in the autumn of that year was made general superintendent of the line from Marysville, Pa., to Quantico, Va. On January 1st,

1883, he was made general agent of all the properties the P. R. R. Co. had any interest in about Baltimore, namely, the Northern Central, the P., W. & B., the Union R. R. Co. and the Baltimore and Potomac, and held that position until he retired in 1905. On November 18th, 1881, he wrote to Mr. Thomson, general manager, that he thought "the time has come to open negotiations with the Canton Co., as they are evidently disposed to deal with us in a friendly spirit, and I think it much better to buy the Union Railroad if it can be secured at a reasonable price, which I think it can, than to build a new road." He testified that Mr. Newcomer was selected to conduct the negotiations, but he knew that a line was projected to connect the P., W. & B. and the Baltimore and Potomac—it was proposed to parallel the Union R. R. and also to turn to the proposed road the heavy through traffic of the Northern Central. He said that line was intended to serve both—"Primarily the P., W. & B. and the Baltimore and Potomac". He was then asked: "Can you state from your information on the subject at the time in what interests the project of acquiring the Union Railroad was started?" and replied: "Unquestionably in the interest of the three railways in interest, namely, the Northern Central, the Baltimore and Potomac and the P., W. & B. It was so understood by all parties, I am sure, including myself."

Mr. John P. Green was assistant to the president of the P, R. R. Co. until October 1st, 1882, when he was elected fourth vice-president. He held executive positions after that until he was retired as first vice-president in 1909. He was also a director of the P. R. R. after October, 1882. He was a director and member of the road and finance committees of the Northern Central in 1881 and 1882. He was elected second vice-president on March 1st, 1883, and was an executive officer of that company until his retirement. He was elected a director of the P., W. & B. R. R. Co., "on January 13th, 1881" (the record so states, but is probably

an error), and second vice-president on February 27th, 1893, and was an executive officer until his retirement. In answer to the question whether he was acquainted with the negotiations for the purchase of the Union R. R. Co., the reasons for the same, and the intention with which it was acquired, he said: "The reasons for purchasing the same were very clear. The Union Railroad Company was owned by a private corporation, the Canton Company, and through the ownership of the Union Railroad it controlled the link between the Philadelphia, Wilmington and Baltimore road on one side, which the Pennsylvania Railroad had acquired in the early part of 1881, and the Northern Central and the Baltimore and Potomac on the other; and it was necessary, in the judgment of the Pennsylvania Railroad Company, to either acquire the ownership of that line, or, in case they could not make any arrangement for its purchase, to build another line between those points. The question was brought to the front practically as soon as the Pennsylvania Railroad Company became the owner of the P., W. & B. Their intention in purchasing it was to do what the Pennsylvania Railroad Company always tried to do, and that was to control the terminals or the terminal roads over which the traffic in its system had to pass. That is pretty much the whole story."

At the time of the purchase the Northern Central was furnishing nearly 90 per cent. of the business of the Union R. R. Co. The P R. R. Co. obtained control of the P., W. & B. in June, 1881, and immediately went to work to develop its southern business over the P., W. & B. and the B. & P. The gross earnings of the Union R. R. Co. increased from $229,443.83 in 1882, to $664,899.68 in 1893—the year before the transfer to the P., W. & B. of the 5,000 shares. It cannot be doubted that credit for the success of all of these roads—including the Northern Central—was due in part to the management of the P., R. R. Co. The officials of the Northern Central, the Baltimore and Potomac and, after control of it was acquired, the P., W. & B. were officials

of the P. R. R. Co. Had the P., W. & B. not been acquired by the P. R. R., the Union R. R. would in all probability not have been the marvelous success that it turned out to be, and it is equally true that the Northern Central could not have received the immense income it did receive from the Union R. R. Co. had not the P., W. & B. been purchased by the P. R. R. The direct route of the latter system between New York and Philadelphia and other cities north of Baltimore on the one hand, and those south of it on the other, was over the P., W. & B., and as the latter was furnishing over 41 per cent. of the business over the Union R. R. every principle of equity and justice demanded that it should receive some recognition of the business furnished by it to this short, but important link in the system, which had been acquired in the name of the Northern Central, but no one can doubt from the evidence was acquired at the price it was because its owners feared that the P. R. R. Co. would build another road, if it could not secure that one. Mr. Brooks' letter of January 9th, 1882 shows what he had in mind and he was directed by his board to offer the road *"to the Pennsylvania Railroad Company and associates (not to any other party)"*, and the agreement of February 15th, 1882, for the sale of the stock of the Union R. R. Co. shows that while the Northern Central was the named purchaser it was believed, if not known, that some other company or companies had some interest in it, for it was not in the usual terms, but reads "the Northern Central Railway Company, as purchaser, their successors and assigns, *or whatever corporation or person shall actually become the purchaser thereunder"*—the author of the expression doubtless having in mind the P. R. R., which was the company the Canton Company was most interested in binding.

It is true that the Baltimore and Susquehanna R. R. Co., one of the constituent companies of the Northern Central, had in mind as early as 1853, the desirability of reaching tidewater at Canton, and by the Act of 1853, Chapter 191,

it was given power to extend its road by steam to tidewater. An ordinance of the City of Baltimore was passed in 1854 providing for the construction of a branch by it, over a route similar to that of the Union R. R. The construction of the road was actually begun by the Northern Central, which was incorporated in 1854, and was a consolidation of the Baltimore and Susquehanna and some roads in Pennsylvania, authorized by the legislatures of the two States. But it was finally abandoned by the Northern Central, which then turned its attention to helping the Union R. R., but in the report of 1868 said that road had been compelled to suspend, at least temporarily. Finally in 1873 it made the agreement with that company for the use of its road above referred to, but in its report for 1874 it said "it will be necessary to obtain more favorable terms for such tonnage than the existing contracts secure."

With the exception of some efforts which Mr. Wrenshall said he thought were made a year or two before the purchase, further *active* efforts seemed to have ceased until a few months after the P. R. R. obtained control of the P., W. & B., when negotiations were renewed and resulted in the purchase. The P. R. R. then owned the greater part of B. & P. stock and of the P., W. & B. stock, but less than a majority of the Northern Central. It could have put the Union stock in the name of either of the three companies, or in all or any two of them, instead of in the one. The offer of sale was to the P. R. R. and associates, and the fear that it would build another line was undoubtedly the inducement for the Canton Company to sell at the price it did. The annual report of the P. R. R. for 1882 speaks of the purchase by the Northern Central and said: "The acquisition of this line has largely tended to strengten and improve the position of that company in Baltimore, and *gives your company the indirect control of the connecting link* in that city between the Philadelphia, Wilmington and Baltimore, the Northern Central and the Baltimore and Potomac Rail-

roads." The only reasonable explanation that can be given for placing the stock in the name of one, instead of all of the allied companies of the P. R. R., is that the Northern Central was then the principal contributor to the business of the Union R. R., and as it was a part of the system of the P. R. R., and the other stockholders were then working in harmony with it, it was not deemed material as to which company held the stock of the Union R. R. It was not a purchase of a property of doubtful value so long as the P. R. R. system controlled the three companies which were then or were to be its feeders, for although circumstances, such as building a competing line, might prevent it becoming much more valuable than it then was, it could still be used by the Northern Central for its purposes, and there was no danger of it losing by the investment made in its name. The extent of the benefit to the other two was undertermined and unknown, but inasmuch as the business of the Northern Central alone insured it against loss, no injustice could be done it by making it the purchaser. It in fact has not only not lost, but on a net investment of $50,000.00 owns a controlling interest in the company which has been freed from the liens of a million and a half dollars, besides paying such large dividends. If it had originally been taken in the name of either the P., W. & B. or the B. & P., or both, the stockholders of the Northern Central might have had reason for complaint, unless there had been some satisfactory arrangement with it, such as the defendants claims was the understanding as to the P., W. & B., or as to the tolls.

As matters stood in 1893 and 1894, and had stood since 1882, the Northern Central was the undoubted holder of all the stock of the Union R. R. Co., and 5,000 of the 12,000 shares of stock of the Union R. R. were transferred to the P., W. & B., virtually at par, as the $50,000 does not seem to have been originally a part of the purchase price. But at the same time no unbiased person can read this record without being impressed with the fact that the original purchase

was not intended to be for the benefit of the Northern Central alone, and it certainly was not intended to enrich the one of the companies forming the P. R. R. system at Baltimore at the expense of the other two. Mr. Newcomer on November 3, 1893, wrote Mr. Thomson, who was the Vice-President of the P. R. R., the Northern Central and the P., W. & B., that he understood he was to formulate something looking to a sale by the Northern Central of a portion of its stock in the Union R. R. to the P., W. & B. He accordingly prepared a statement in which he took the sources of revenue of the Union R. R. for 1892, and on that basis the Northern Central had earned 56.57 per cent., the P., W. & B. 41.77 per cent. and the B. & P. 1.66 per cent., and he said it was suggested that the Northern Central sell to the P., W. & B. 43 per cent. of the capital stock of the Union R. R. at par—giving the Northern Central 6,840 shares and the P., W. & B. 5,160 shares. In speaking of the amounts distributed to the two companies, beginning with the year 1890, he referred to a fact that appears in the record, that from that year the Northern Central had returned to the P., W. & B. certain amounts received by it from the dividends of the Union R. R. Co., which were supposed to compensate the P., W. & B. for the large amount of traffic it had furnished the Union R. R. Co. at the rates fixed in the agreement of 1873.

On December 2nd, 1893, Mr. Green, Vice-President, wrote to Mr. Newcomer that he had drafted a form of agreement between the two companies to cover the proposed purchase of stock in the Union R. R. He said he had submitted it to Mr. Roberts who thought it was about in the right form, and he would be glad to have Mr. Newcomer's views in regard to it. On December 4, 1893, Mr. Newcomer replied that he thought it covered the ground entirely and satisfactorily, and suggested that as the period was so near for declaring a dividend on the stock of the Union R. R., and as the Union R. R. was about to make sale to the Northern Central of a num-

ber of small tracts of land purchased by it since the stock was purchased, and as the deed would be executed before January 1st, 1894, that the contract for sale of the stock be not executed until after January 1st, to take effect from that date. That proposed agreement recited the purchase and ownership of the stock by the Northern Central; that the Union R. R. formed the connection between the Northern Central and the terminal facilities at Canton, and also the connection between the Northern Central and the Baltimore and Potomac on the one hand, and the P., W. & B. on the other, that a large amount of the traffic passing over the Union Railroad was contributed by the P., W. & B. and the proportion contributed from January 1st, 1890, to August 31st, 1893, was about 43 per cent.; that "Whereas, at the time of the purchase of the said Union R. R., it was the understanding of the said Philadelphia, Wilmington & Baltimore Railroad Company that its interest would thereafter be protected on a fair and equitable basis," and other provisions.

On December 5, 1893, that communication was referred to Mr. Frank Thomson, First Vice-Pres., by Mr. John P. Green, Second Vice-Pres., with request that he notice what Mr. Newcomer said in regard to the enclosed form of contract. On December 6th Mr. Thomson returned it to Mr. Green with the endorsement, "This contract looks all right now, and I think it will be well if you will have it put in proper shape for action of the Board." It was however never executed, but Mr. Green testified "The subject matter of the agreement was afterwards covered and practically put into effect by resolutions of the Board of Directors of the two companies, the Northern Central and the P., W. & B." Although that agreement was not executed, it was kept with the papers of the company and we now refer to it because it shows what the officers of the company understood to be the understanding in reference to the stock, and Mr. Green in his testimony referred to it in that connection. At a

meeting of the directors of the Northern Central, held February 15, 1894, the president laid before them a resolution received from the P., W. & B. and adopted by that company. It recited that whereas the Union R. R. is the connecting link between the road of that company on the one hand and the Northern Central and the Baltimore and Potomac on the other, and it is to the interest of the company that it should have a proper ownership in the capital stock of the Union R. R. by reason of it furnishing the most available line, not only for reaching the passenger station in Baltimore but for a connection with the Southern system of railways, and whereas about forty-one per cent. of the business of the Union Railroad is controlled by this company, "Resolved, that the Northern Central Railway Company be requested to sell the Philadelphia, Wilmington and Baltimore Railroad Company at least five hundred thousand dollars of the capital stock of said Union Railroad Company of Baltimore, at a price not exceeding par." The directors of the Northern Central adopted a resolution that it sell to the P., W. & B. at par five thousand shares of the capital stock of the Union Railroad, as of January 1st, 1894, the purchase money to bear interest at six per cent. until paid.

As of January 1st, 1894, the P., W. & B. gave its note to the Northern Central for $500,000.00 payable on demand, with interest from date—the five thousand shares of stock of the Union Railroad being deposited as collateral. On November 9th, 1894, there was a special meeting of the directors of the Northern Central at which there was a resolution passed, that whereas the P., W. & B. had tendered the sum of $500,000.00 in settlement of the note for the purchase, and whereas under advice of the chairman of the Finance Committee the treasurer had declined to receive it, it was resolved that the Board of Directors of the P., W. & B. be requested to appoint a committee of conference on the subject, and appointed Messrs. B. F. Newcomer, Henry James and J. N. Hutchinson, a committee on the part of the

Northern Central. At a meeting of the board on November 28th, 1894, a joint committee composed of those just named and of three others representing the P., W. & B. recommended "That as a just and equitable settlement of the whole question, the Philadelphia, Wilmington and Baltimore Railroad Company should pay to the Northern Central Railway Company the sum of $550,000.00 with interest at six per cent. per annum on $500,000.00 of the amount to date of payment on December 28th, 1894, the said stock to be absolutely the property of the Philadelphia, Wilmington and Baltimore Railroad Company." That report of the committee was approved and adopted by the respective boards of the two companies.

On February 19th, 1895, the report of the President and Directors of the Northern Central for the year of 1894, with accompanying treasurer's statements, was presented and read at the director's meeting, and on motion the report was adopted, and the secretary was directed to have a synopsis of it published in the Baltimore papers, have the report distributed among the stockholders, and to present it at their annual meeting to be held in Batlimore, February 28th, 1895. The report was published in the *American*, the *Sun* and the *News*, daily papers of Baltimore, and copies of the report were sent to the stockholders. At the stockholders' meeting the report was approved and adopted, and the thanks of the stockholders tendered to the President and Board of Directors for their able and faithful management of the affairs of the company during the past year. In the report was this statement: "In order to give the companies contributing traffic to the Union Railroad of Baltimore an ownership therein based upon the amount of such contributions, 5,000 shares of the stock were sold to the Philadelphia, Wilmington and Baltimore Railroad Company, the remaining 7,000 shares being held by your company." Accompanying the report were various statements, including "Statement of Bonds and Stocks owned by the Company," which

showed that only 7,000 shares in the Union R. R. Co. were still held by the Northern Central.

Mr. Newcomer, who carried on the negotiations in 1881 and 1882, for the purchase of the stock of the Union R. R. Co., was a director in the Northern Central from March 21st, 1862, to December 18th, 1874, and again from February 28th, 1878, until March 30th, 1901, the time of his death. He was chairman of the Finance Committee from February 28th, 1879, until his death. He was also a director of the P., W. & B. from January 9th, 1882, and a member of its Finance Committee from January 26th, 1885, until his death. He held 226 shares of stock of the Northern Central when the transfer was made to the P., W. & B. and shortly afterwards acquired 74 more—holding the 300 shares until his death. He was also President of the Safe Deposit and Trust Company of Baltimore, and during the years 1893 and 1894 that company held 46 shares in its own name and 433 as trustee in the Northern Central. He thus had every reasonable opportunity to be familiar with the circumstances connected with the purchase of the Union Railroad in 1882, and with the transfer of the 5,000 shares to the P., W. & B. He is accused in the brief of the plaintiffs of bias in favor of the P. R. R., but there is nothing in the record to base the accusation on, unless it be the mere fact of his connection with these two roads and the statement that he was interested in the Atlantic Coast Line R. R. There is certainly nothing to justify the intimation that he would deliberately be a party to taking the property of one company and transfer it to another for less than its value, simply to please the owners of the stock of the latter.

The evidence does not sustain the allegation in the bill that the stock of the Union R. R. Co. was worth $1,000 a share in 1894, although it was doubtless worth more than par. That would have made this railroad of a few miles in length worth, including the liens, about $13,000,000.00— although it had been purchased twelve years before for

$2,100,000.00. It is true that it had been improved, but the improvements were made out of its own earnings, and gave it no such value as alleged. It was simply a toll road, depending entirely upon what amount of traffic other companies carried over it, and the rates it could obtain. Up to the time of the transfer of the 5,000 shares, the highest gross earnings of the Union R. R. received in any year were $704,-501.84 (for the year 1892), of which the P., W. & B. contributed $294,290.81. In the year 1893 they fell off to $664,899.68, and in 1894 to $489,798.94. The dividends which were declared in 1890, 1891 and 1892, estimating the stock at $1,000.00 a share, would have amounted to 2 per cent., for 1893 less than four per cent., and for 1894, 2½ per cent. That of itself shows the extravagance of the statement, but when we remember that the large income of the Union R. R. was the result of burdensome and unreasonable charges for tolls, according to the claim of the Northern Central as far back as 1873, when the business was very small as compared with what it was in the 90's, and that the P., W. & B. was contributing over 41 per cent. of that income, the statement of the value of the stock *as against it* is certainly not borne out. As long as the Northern Central was getting all of the benefit of the income, it was to its interest to maintain the high rates fixed before it became the owner of the stock, as what it paid itself was largely a matter of bookkeeping—taken out of one pocket and put in another—and as to the other patrons of the road, the higher the rates, the greater its income.

But after the P., W. & B. became a large contributor to the income of the Union R. R., especially when it reached over 40 per cent., can it be supposed that its stockholders would have quietly submitted to such tolls as were charged, if some equitable arrangement had not been made? Surely if the charges made by the plaintiffs against those who as officers or directors represented the two roads at Baltimore are true—that they were under the influence and control of

the P. R. R. Co., (and violated the trust reposed in them by their stockholders in order to benefit the P. R. R. Co.), regardless of their duty to those they were supposed to represent—they would not have hesitated to have demanded of the Northern Central Railway Company that the rates on the Union R. R. be reduced, and, if it had declined, to have found some other means of carrying the traffic of the P., W. & B. through Baltimore. The officers and directors of the P., W. & B. would have been derelict in their duties, if they had quietly submitted indefinitely to charges which enabled a toll road to pay, 20, 25, 30, 35, 40, 45 and finally 50 per cent. dividends, in addition to accumulations as surplus, etc., when their road was contributing forty or more per cent. to the earnings, unless it was in some way to get the benefit of its proportion. The record shows that since the P., B. & W. was organized,—during the nine years from 1902 to 1910, both inclusive,— the tolls contributed by it to the Union R. R. amounted to $5,157,831.34, and during the same period the Northern Central contributed $5,442,687.76, a difference of less than $300,000.00 in the nine years, and in three of those years it actually contributed more than the Northern Central. In 1894 it was thought that what it was then contributing (a little less that 42 per cent.) was the fair basis to adopt, but in the last three years given in the record (1908-1910) the tolls amounted in all to over $3,900,000.00 contributed by the two companies, and the P., B. & W. actually contributed $62,670.82 more than the Northern Central, although the Northern Central was getting 58 1/3 per cent. of the dividends and the P., B. & W. 41 2/3 per cent. The two roads furnished practically all of the gross earnings to the Union R. R. Out of $1,561,953.01 gross earnings in 1910, only $19,318.95 were contributed by others. It is true those years were since 1894, but under the decree passed in the lower Court the dividends for those years as well as all others since 1894 were required to be returned.

It has been suggested that the Baltimore and Potomac was ignored, although as much entitled as the P., W. & B. was in 1894 to some of the stock, in proportion to what it contributed, according to the theory of the defendants. The evidence shows that its contributions to the earnings were insignificant, but most of the stock of both of those companies was owned by the P. R. R. Co., and hence as to such stock it was not material. If, however, by the system of book-keeping adopted, or in any other way, the minority stockholders of the B. & P. were improperly and unjustly affected by the transfer to the P., W. & B., and they were entitled to relief, it was for them and not for those of the Northern Central to complain. Since the consolidation in 1902 of the P., W. & B. and the B. & P. (during which time over two-thirds of the dividends sought to be recovered have been paid) they have had the benefit of the transfer to the P., W. & B., and if there were any rights or equities existing in their favor at the time of the consolidation, in the absence of evidence to the contray, they were presumably then adjusted. The dividends declared from 1894 to 1901, both inclusive, to the P., W. & B. amounted to $1,700,000.00 while those from 1902 to 1910, both inclusive, to the P., B. & W., were $3,517,500.00.

We have thus referred to the testimony at great length, by reason of the fact that the record presents circumstances which are unusual, and are necessary to be considered in applying the principles of law which must control our decision. We have not overlooked the fact, but have incidentally in part referred to it, that in 1893, 1894, and subsequent years, the President and Vice-Presidents of the Northern Central also held the same offices in the P. R. R. Co. and in the P., W. & B. R. R. Co. although only four of the twelve directors of the Northern Central in 1893 and 1894 were directors in the P. R. R. Co. and three of those four and Mr. Newcomer (who was not a director of the P. R. R.) were also directors of the P., W. & B. Eight of the

twelve were not directors in the P. R. R., and only one of the eight (Mr. Newcomer) was a director in the P., W. & B. Nor are we unmindful of the fact that even before the P. R. R. Co. obtained a majority of the stock of the Northern Central (in 1900) it may have in a large measure, if not wholly, controlled the selection of the directors in the Northern Central. But it would be unfair and unjust to assume that all of those directors would be such subservient tools of the P. R. R. Co., or any other railroad company as to deliberately transfer to it or to one of its subsidiary companies, assets of the company they represented without there being what they believed to be sufficient reason and consideration for their action.

It was decided in *Booth* v. *Robinson,* 55 Md. 420, quoting from the syllabus, which is sustained by the text: "There is no legal presumption of illegality or unfairness in transactions between two corporations, from the mere fact that a portion of the Board of Directors in the one company constitute a part of the Board of Directors in the other at the same time, and participated in the dealings between the two corporations. It is only when their dealings are shown to be prejudicial to the one or other of the corporations represented by them, that their conduct will be subject to a strict and severe scrutiny by the Courts." See also *Davis* v. *U. S. E. P. & L. Co.,* 77 Md. 35; *Hagerstown Manfg. Co.* v. *Keedy,* 91 Md. 430. In *Shaw* v. *Davis,* 78 Md. 318, JUDGE McSHERRY said: "The fact that the same persons hold the majority of stock in both companies does not of itself enlarge the Court's jurisdiction; the act complained of furnishes the test of jurisdiction, and it must be *ultra vires,* fraudulent or illegal; nothing short of this will suffice. This is true even in a case where the directors and not stockholders do the act complained of. *Booth et al.* v. *Robinson et al.,* 55 Md. 441. And for stronger and more obvious reasons it is also true in a case where stockholders themselves act directly. They are not trustees or *quasi* trustees for each

other. Even a director is not, strictly speaking, a *trustee.*" In *Booth* v. *Robinson, supra,* the bill made some charges very similar to those in this bill, and JUDGE ALVEY reviewed the charges and the law in his forcible and thorough way, and in the course of the opinion said: "This case is altogether unlike that of a trustee, agent or director, bargaining in a matter of personal advantage *to himself individually,* with the party reposing the confidence in him, and where it is incumbent upon him to show that a fair and reasonable use has been made of that confidence; as in the cases of the *Hoffman Steam Coal Co.* v. *Cumbld. Coal & Iron Co.,* 16 Md. 456; *Cumbld. Coal & Iron Co.* v. *Parish,* 42 Md. 598; *Jackson* v. *Ludeling,* 21 Wall. 616, and other cases of that class to which reference might be made." The opinion went on to say that in such cases as those referred to the law proceeded upon the principle of constructive fraud, irrespective of fraud in fact, and hence the onus of proof is upon the party seeking to maintain the transaction, but that in a case like that of *Booth* v. *Robinson,* the proof in support of the allegations must be other than mere constructive fraud, and "there must be affirmative proof of the misconduct charged, going to establish the fraud in fact."

The learned judge below said: "It is not necessary, and to my mind it would not be proper, to characterize the transaction as tainted with moral wrongdoing on the part of the actors in it," and he went on to say that he could readily conceive that the officers of the several roads, particularly those connected with the purchase "may have come to believe that the purchase, which was in a sense undoubtedly made 'in the interest' of the Philadelphia, Wilmington and Baltimore Railroad Company, as well as the Northern Central Railway Company, should have been consummated differently from the way it was consummated, and that an unintentional wrong to the Philadelphia, Wilmington and Baltimore Railroad Company had been done by them in not so consummating it, as they undoubtedly at the time of the

purchase had the power to have consummated it, and that it would be equitable and just to do in 1894 what they could have originally done and would have done had they foreseen the future," and he then concluded by saying: "But what they undertook to do to rectify the mistake that had been made was clearly *ultra vires* and must be condemned."

We think it clear that the learned judge was right in acquitting the parties of wrongdoing, for whether or not it be said that what we have quoted from *Booth* v. *Robinson* above is wholly applicable to this case, and the burden would be held to be on the plaintiffs, to prove fraud, and it would be difficult to distinguish between that case and this in applying the rule (and it can not be fairly claimed that any director, officer or agent connected with the transaction obtained "personal advantage to himself individually"), or whether we place the burden on the defendants, the transfer of the stock to the P., W. & B. can not be held to have been fraudulent, under all the circumstances of this case. Can it then be properly said to have been *ultra vires?* If there was no question about the price obtained for the 5,000 shares, it could not be contended that the sale was *ultra vires,* for if there be any doubt about the power of the officers to make it, it was unquestionably ratified by the directors who appointed the conference committee, adopted the report of that committee and also ratified and adopted the annual report. *They* certainly knew of the sale, and we might add also, the price. But in addition to that, the stockholders adopted the report, and unless stockholders are not to be bound by anything in an annual report of their president and directors by their adoption of it, excepting in so far as they specifically and particularly mention matters contained in it, the stockholders of this company, whether present or absent, would have been bound, in the absence of fraud, by this sale. We take it that that would not be disputed, for if it was *ultra vires* to sell a part of this stock to a connecting road, it must have been *ultra vires* to buy it, unless there was some special power to buy and no power to sell a part.

As then the directors, and certainly the stockholders, had the undoubted power to sell a part of the stock and did sell five-twelfths of it at a price which was almost equal to what their company paid for the whole, it is not easy to see how the sale can properly be said to have been *ultra vires,* even if it was sold for less than it was worth, unless it was fraudulent in fact, or at least the consideration was so grossly inadequate that fraud must be presumed. In other words, if the power to sell be admitted, and the only question be whether the directors or the majority of the stockholders had the power to sell at the price they sold or ratified, does it not in reality come back to the question whether there was fraud? It is said in *France on Elements of Corporation Law,* section 77: "It seems to be settled in this State that where a transaction is illegal because forbidden by some statute or by the charter or by some doctrine of public policy—then the question presented is one of illegality and not of *ultra vires* in the proper sense of the term; and this is in accord with the weight of authority." In *Machen on Modern Law of Corporations,* section 1012, in speaking of the phrase *"ultra vires,"* it is said: "In its proper sense it denotes some act or transaction on the part of a corporation, which, although not unlawful or contrary to public policy if done or executed by an individual, is yet beyond the legitimate powers of the corporation as they are defined by the statutes under which it is formed or which are applicable to it, or by its charter or incorporation paper. The misuse of the term consists in applying it to any act or transaction which is beyond the lawful powers of any person * * * Again, no man has the lawful power to commit illegal acts, and hence any violation of law is said to be *ultra vires.* But all these uses of the phrase are unfortunate and confusing, and should be rejected in favor of the narrower meaning as defined above."

In section 1588 of that work it is said that "it is everywhere agreed that dealings between a company and one or

all of its directors may be authorized or confirmed by the shareholders, and in that case will be binding. And such contracts so authorized or confirmed are not impeachable by creditors unless actually fraudulent;" and again in section 1589: "The question of confirmation *vel non* should be explicitly submitted to the shareholders; but it is sufficient if a report containing a notice of the matter is read and adopted. Indeed, the approbation of the shareholders may be inferred from acquiescence, or the company's right of rescission may be lost by laches."

In section 1590 it is said: "In order that the confirmation may be effective, full disclosure must be made by the interested director to the shareholders. Where the shareholders know that a director is interested and is making a profit on the transaction, it is not necessary that they should be informed of the *amount* of his profit. It has been held that confirmation by the shareholders is not binding unless made with knowledge that the transaction is voidable in law;" and in section 1591: "The majority may confirm the contract; and it is, therefore, unless smirched with actual fraud, impregnable as against the attack of a minority shareholder. And the interested director, although expressly prohibited from voting as a director, may nevertheless vote as a shareholder—the resolution of confirmation being none the less effective because carried by his votes. Of course, in any case—and particularly where the deciding votes are cast by interested parties—the confirmation by the shareholders may be challenged on the ground of fraud; and according to some authorities, as well as sound principle, the onus of disproving fraud rests upon the interested directors, especially where they control a majority of the shares. If fraud exist, the confirmation will not be valid unless, rejecting the votes of the fraudulent shareholders, a majority in favor of confirmation still remains. Indeed, contracts in which a director has an interest are not *ultra vires,* and are voidable by the corporation only, hence a minority shareholder can never enjoin

the execution of such contracts, unless they are actually fraudulent, if the shareholders are to have an opportunity to avoid them.    Failure to submit the contract to the shareholders for ratification does not render it void, it remains merely voidable by the company—that is to say, it is still valid until disaffirmed by the corporation, and it is the company's right of disaffirmance that is tolled by ratification by the shareholders."    Then in section 1592 it is said: "A consequence of this power of the shareholders to ratify a contract made by an interested director is that where a director himself owns a majority of the shares, he may in any case force ratification of a contract in which he has an interest, unless there be actual fraud; and hence in such cases the rule that such contracts, whether in fact fraudulent or not, are always voidable by the company is illusory.    Its place is taken by the rules of law applicable to one who holds the majority of shares in a corporation."

We thus quote at length from this work because it is one of the few books on the subject written by a lawyer of this State, and the author has with his well known zeal and ability discussed a number of the questions involved in the case, supporting most of them by numerous authorities.    Applying these principles, which we do not understand to be controverted, what must be the result?    In the first place, the report of the president and directors was published in three leading newspapers of Baltimore and was sent to the stockholders before the meeting, and at the annual meeting it was approved and adopted.    The minutes do not show how many votes were cast for that resolution, but there were 106,431 votes cast at the same meeting for the election of directors, over 36,000 more than the P. R. R. had at that time, and presumably all of the votes represented were cast for the resolution, as there is no evidence to the contrary.    In that report it was distinctly stated that, *"In order to give the companies contributing traffic to the Union Railroad of Baltimore, an ownership therein based upon the amount of such*

*contributions,* 5,000 shares of its stock were sold to the Phila-
delphia, Wilmington and Baltimore Railroad Company, the
remaining 7,000 shares being held by your company." The
stockholders of the Northern Central certainly knew that the
P., W. & B. was a part of the P. R. R. system; they had
been so told a number of times; notably by the report sub-
mitted February 23rd, 1882, in reference to the purchase
of the Union R. R., and their case is largely based on the
charge that the P. R. R. controlled the Northern Central.
They certainly knew that it was largely interested in both
roads, and had the same officers for all of them. They
knew that the sale was not being made in order that the
Northern Central might make a profit out of it, but in order
to give the companies contributing traffic to the Union R. R.
an ownership therein based upon the amount of their con-
tributions, but did not mention the price at which it was
sold. As they knew that the Northern Central had originally
paid par, the most natural inference from the statement
made in the report was that it was sold at not more than par.
Inasmuch as they knew that the Northern Central had re-
ceived a stock dividend of 6,000 shares in 1887, and hence
the capital stock was double what it was when it bought it,
they might have supposed from the statement made in the
annual report that it had received less than par, but there
was nothing in the statement to mislead them and to cause
them to believe that it was for more than par.

But suppose some stockholder other than the P. R. R. Co.
had objected to the sale at par at the time it was approved,
can it be said that a Court of Equity would have been justi-
fied in enjoining or rescinding the sale under the circum-
stances shown by this record, if application had then been
made? It may be conceded that the P., W. & B. under the
evidence could not have gone into Court and have required
the Northern Central to transfer to it an ownership in the
stock based on the amount of its contribution to the traffic
over the Union R. R., but that was not the question. The

real question would have been, under the authorities above cited, whether the sale was fraudulent, or we might go further and say, whether the majority of the stockholders were taking such an unfair advantage over the minority as to require the interposition of a Court of Equity. If the law be as quoted above, that "The majority may confirm the contract; and it is therefore, unless smirched with actual fraud, impregnable as against the attack of a minority stockholder. And the interested director, although expressly prohibited from voting as a director, may nevertheless vote as a shareholder—the resolution of confirmation being none the less affective, because carried by his votes;" if, as the opinion of the lower Court says, those who had been concerned in the purchase of the Union Railroad had come to believe that "an unintentional wrong had been done by them" in not protecting them in the original purchase, and if, as the uncontradicted evidence shows, the P., W. & B. was contributing over forty per cent. of the entire gross earnings of the Union R. R. and the original purchase was made at least in a sense in the interest of the P., W. & B., can it be said that it was a fraudulent act on the part of the majority of the stockholders to right that wrong? Would that have been such equity as a Court of conscience is supposed to administer? But that is not all, for as we have already pointed out, it was only by reason of the burdensome charges which the Northern Central had complained of as far back as 1873 or 1874, and which had been again referred to in the annual report for 1882—the one speaking of the purchase—that such large gross earnings had been received, and in 1894 and for some years before the P., W. & B. was contributing a considerable part of them. The Northern Central had not only to a large extent been paying itself back what it had paid out in tolls, but it had been collecting from the P., W. & B. what it admitted to be burdensome. In short it was enriching itself at the expense of another company which belonged to the same system of railroads it did—

a system which in other ways undoubtedly added to its prosperity. If the minority stockholders of the Northern Central had the right to complain of the sale, why had not the minority, as well as the majority, of the P., W. & B. the right to complain of the wrong done them?

But as we have already suggested above, can it be doubted that if the sale had not been consummated, the P. R. R. Co., owning the bulk of the stock of the P., W. & B. and the B. & P., would either have demanded a reduction of the tolls or would have built another line? Its business on those roads would have justified it, rather than continue to pay such rates to that company, if it did not recognize their rights as large contributors to this traffic. Then they had in 1894 the benefit of the knowledge of Mr. Newcomer and others who had taken part in the purchase of the road in 1882, and who knew what the understanding of those connected with it was. So however it might seem in 1910, when the gross earnings of this road were seven times as large as they were in 1882, and over three times as large as they were in 1894, it can not be said that there was any fraud, or even what might be called "Railroad overreaching," in the sale by the majority of the stockholders of the Northern Central in 1894, and hence a Court of Equity would not have been justified in enjoining or setting aside the sale, if application had been made in 1894 or soon thereafter.

Having reached that conclusion, it would be useless to discuss the question of laches, but existing conditions should unquestionably cause a Court of Equity to now hesitate more than it might have done then. Messrs. Newcomer, Roberts, Cassatt and Thomson, the principal actors are dead, and records of all that transpired are at least more inaccessible, if some are not lost. The persons named might, if living, have shed much light on some of the questions. The P., W. & B. and its successor the P., B. & W. were permitted for over sixteen years after the sale was made to

rest under the belief that it was regularly approved by the stockholders of the Northern Central, and so far as is shown not one stockholder objected to or disapproved of it. Year after year they continued to increase their contributions to the tolls, at rates which it can not be imagined would have been submitted to, if they had not supposed, as they had the right to suppose, they would be largely compensated for by dividends. And yet, there was no step taken in Court to set aside the sale made for more than 16 years. It is true that the plaintiffs testified they were ignorant of the price received, and of the circumstances until shortly before the bill was filed, but as with the exception of Mr. Minis they were not stockholders at the time, they would not likely have known anything about it. Mr. Minis does not say that he did not know of the sale, but did not know of the terms of it, until the latter part of 1909 or January, 1910. Those who were stockholders in 1894, especially those who were residents of Baltimore City, had every opportunity to know, and must be presumed to know, that a sale had been made, as early as 1895, and without determining whether or not the annual report for the year 1894, which was sent to its stockholders before the annual meeting and published in the Baltimore papers after it was approved, was sufficient to require them to make further investigations or else be precluded from relief in a Court of Equity, unless steps be taken within a reasonable time, the fact that the P., W. & B. and the P., B. & W. had been permitted to hold the stock for 16 years, had continued to use the road during that time paying high rates therefor, and now at the end of that time millions of dollars are demanded of the P., B. & W. which had been returned to it and the P., W. & B. in dividends as the result of the supposed ownership of shares of stock by them based upon the amount of their contributions to the traffic of that road, should cause a Court of Equity to hesitate more to set aside the sale than it might have done at or about the time it was made.

We have not attempted to review in this opinion many of the numerous authorities cited, although we have given the authorities and the facts full and careful consideration, because the principles of law involved are for the most part well settled, and the case is to be determined on its peculiar facts which in the main are not disputed. We do not deem it necessary to discuss the exceptions to testimony, and in view of the conclusion we have reached it becomes unnecessary to refer to the appeal by the plaintiffs. The decree will be reversed and the bill dismissed.

> *Decree reversed and the bill dismissed, the appellees in No. 29 (the plaintiffs below) to pay the costs.*